**STATE OF NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION, Plaintiff,**

v.

**GLOUCESTER ENVIRONMENTAL MANAGEMENT SERVICES, INC., et al., Defendants.**

**Civ. No. 84–0152(B).**

United States District Court, D. New Jersey.

April 14, 1991.

Sr., Atlas Recycling Co., Atlas Environmental Co., Inc., Crispin Bros. Rubbish Removal, Bennie's Hauling Service, Northeast Disposal Co., Inc., A. Marianni's Sons, Inc., William Adams & Son.

E. Hunter Taylor, Jr., Gerstein, Cohen & Spevak, Haddonfield, N.J., for John Harrington.

Richard B. Supnick, Mitnick, Vogelson, Josselson & DePersia, Haddonfield, N.J., for Thermo–Kold Equipment & Supply.

Edward J. McCarthy, Mylotte, David & Fitzpatrick, Westmont, N.J., for Anthony M. Brida, Inc.

Horace A. Stern, Fox, Rothschild, O'Brien & Frankel, Philadelphia, Pa., for Charles Crumbley, Inc.

John A. Gonnella, Caldwell, N.J., for Tri–County Disposal Service, Inc.

Michael P. Albano, Zane, Lozuke & Albano, Woodbury, N.J., for Five County Carting, Inc., Delaware Valley Refuge Container Co., Inc., Frank Sargent, Inc., and Kaut & Kaut, Inc.

Jonathan Eron, Thatcher & McNeill, Runnemede, N.J., for Continental Vanguard, Inc.

Carl R. Woodward, III, Carella, Byrne, Baine & Gilfillan, P.C., Roseland, N.J., for Robert Hargrove Enterprises and William Castner.

Kenneth N. Gjurich, Frank B. Weisz & Associates, P.C., Philadelphia, Pa., for Richard S. Burns and Bill's Container Service.

Michael A. Zielinski, Weiner, Hendler & Derman, P.A., New Brunswick, N.J., for Eastern Indus. Corp.

James B. Moran, Hoagland, Long, Oropollo & Moran, New Brunswick, N.J., Gary M. Perkiss, Philadelphia, Pa., for Champion Auto Generator Service, Inc.

Robert A. Muccilli, Capehart & Scathard, P.A., Mt. Laurel, N.J., for Daeche & Co., Inc.

Richard V. Engel, Deputy Atty. Gen., Dept. of Law & Public Safety, Div. of Law, Environmental Protection Section, Trenton, N.J., for plaintiff.

---

James Crawford Orr, Wilson, Elser, Moskowitz, Edelman & Dicker, Newark, N.J., Liaison Counsel for Transporters Group.

Marc I. Bressman, Budd, Larner, Gross, Rosenbaum, Greenberg & Sade, Cherry Hill, N.J., for defendants Waste Management, Inc., et al.

David F. Michaelman, Philadelphia, Pa., for Disposal Corp. of America/Jones and Johnson Enterprises, Inc., Glove Disposal Co., Inc., Waste Techniques Corp., Ogden Waste Removal, Mike Spano & Sons, Richard Alburger, William Lawrenson, Jr. &

John F. Lynch, Carpenter, Bennett & Morrissey, Newark, N.J., for Generator Group.

Jeffrey P. Heppard, Parker, McCay & Criscuolo, Marlton, N.J., for Operators Group.

William Greenberg, Sills, Cummis, Zuckerman, Radin, Tischman, Epstein & Gross, Princeton, N.J., for Tp. of Gloucester.

John S. Fitzpatrick, Fitzpatrick, Reilly, Supple & Gaul, New Providence, N.J., for Municipalities Group.

John B. Kearney, Kenney & Kearney, Cherry Hill, N.J., for Operators—AS & G.

## OPINION

JEROME B. SIMANDLE, United States Magistrate Judge:[1]

### I. INTRODUCTION

This matter is before the court upon motion of Wilson, Elser, Moskowitz, Edelman & Dicker, as Liaison Counsel for the Transporters Group in this multi-party hazardous waste case, for an Order compelling all delinquent defendant and third-party defendant Transporter Members of the Transporter Group to satisfy the common fees and expenses of Liaison Counsel incurred on behalf of the Group. These unpaid fees and expenses are for Liaison Counsel's efforts from early 1988 (following Liaison Counsel's selection by the Group) through the end of 1989. The Transporter Group had 137 members as of 1990, as listed in the payment schedule attached to the Affidavit of James Orr filed March 29, 1990. Each group member has been assessed a per capita share of the group's expenses for Liaison Counsel services and costs. The per capita allocation arose from discussions at the earliest group meetings, continued as a practice in several billings over the years.

Transporter Liaison Counsel, James C. Orr, Esquire, seeks an Order compelling payments from the Group Members having outstanding balances, that is, alleged Transporters who have not paid in full the per capita assessment of $3,000 for each member. The members allegedly owing payment were as stated in *Exhibit H* to the Affidavit of James C. Orr (filed Feb. 6, 1990), and these amounts were adjusted for subsequent payments summarized in the attachment to the Supplemental Affidavit of James C. Orr (filed March 29, 1990). These payments were sought for reimbursement of $131,900.01 in unpaid expenses and fees for Liaison Counsel services through the end of 1989, summarized in the following chart:[2]

| | 1st Invoice | 2nd Invoice | 3rd Invoice |
|---|---|---|---|
| | March 1, 1988 To Dec. 1, 1988 | Jan. 1, 1989 To July 31, 1989 | Aug. 1, 1989 To Nov. 30, 1989 |
| Attorney/ Paralegal | $19,587.50 | $ 54,768.25 | $75,388.50 |
| Disbursements | 6,738.86 | 12.808.70 | 7,647.89 |
| Totals | $26,326.36 | $ 67,576.95 | $83,036.39 |
| Grand Total | | $176,939.90 | |
| Payments | | 45,039.89 | |
| Balance | | $131,900.01 | |

---

1. Congress has changed the title of United States Magistrate to United States Magistrate Judge in § 321 of the Judicial Improvements Act of 1990, Pub.L. No. 101–650 (Dec. 1, 1990).

2. The summary of Liaison Counsel's invoices and payments was attached to the Supplementary Affidavit of Marc I. Bressman, Esquire (dated April 11, 1990). The corresponding net unpaid figure reckoned by Mr. Orr was $133,641.33, according to the letter of James C. Orr dated July 13, 1990. The higher amount would apparently encompass services through December 31, 1989.

The actual invoices reviewed by the court disclose slightly different figures, as follows:

1. Invoice No. 16225, Feb. 28, 1989
 (5/16/88—1/27/89)

| | |
|---|---|
| Profess. Services through 2/3/89 | $ 19,487.40 |
| Disbursements through 2/3/89 | 6,029.32 |
| | $ 26,029.32 |

2. Invoice No. 50520, Aug. 31, 1989
 (2/89—6/89)

| | |
|---|---|
| Profess. Services through 8/2/89 | $ 54,768.25 |
| Disbursements through 8/2/89 | 9,821.95 |
| | $ 64,590.20 |

3. Invoice No. 59290, Dec. 28, 1989

| | |
|---|---|
| Profess. Services through 12/1/89 | $ 75,388.50 |
| Disbursements through 12/1/89 | 5,391.90 |
| | $ 80,780.40 |
| Grand Total | $171,399.92 |

We will use this figure of $171,399.92 for the total due through 1989, and subtract payments received in the amount of $45,039.89 to render a net unpaid balance through 1989 of *$126,360.03* for which reimbursement is presently sought.

Furthermore, Liaison Counsel states that his firm's own clients in this case (defendants Manor Care, Inc., Almo–Anti Pollution Services Corp. and Almo Tank Cleaning Services Corp.) were billed over $65,000 for work done from July 1987 through March 31, 1988 while the Transporters Group was still forming. *See* Affidavit of James Orr, filed March 29, 1990, at ¶ 5. These sums were allegedly largely group-related services which could have been passed on to all group members but were instead paid by these Manor Care clients. *Id.* Liaison Counsel requests that these Manor Care clients "be credited for these funds in lieu of a contribution but thereafter be billed a share in accordance with the Court's rulings." *Id.*

Various parties submitted objections, all of which have been considered. As discussed further below, these objections fall into several categories, beginning with the most fundamental:

1. That several members do not agree to Liaison Counsel acting on their behalf, and object to any sharing of Group expenses;

2. That Liaison Counsel should provide a more detailed accounting of billing information;

3. That members unable to pay should receive a hardship exemption;

4. That members related to other member companies and represented by a single attorney should not be required to pay a full per capita share;

5. That certain members who were added to the case after Liaison Counsel's selection in 1987 should not be required to pay a full per capita share;

6. That members believing themselves not to be liable in the underlying litigation should not be required to pay any share.

Many parties submitted no opposition, and a few parties paid their assessment, in whole or in part,[3] while this motion was

3. Parties which indicated that they made payments subsequent to Mr. Orr's Supplemental Affidavit of March 29, 1990, included: (1) Crispin Brothers, 4/4/90, $0 balance remaining; (2) William Lawrenson, Sr. & Jr., 5/4/90, $1,000.00 balance; (3) Richard Alburger, 6/27/90, $0 balance; and (4) Globe Disposal Co., Waste Tech-

under consideration, and two parties were reported as going into bankruptcy.[4]

After discussing the relevant procedural history of this case and of this motion, this opinion will consider each of the above arguments and determine an equitable apportionment of such expenses among the members benefitting from such services.

## II. PROCEDURAL HISTORY

The State of New Jersey, Department of Environmental Protection, filed this action seeking to compel various parties to perform remedial activities to redress conditions at the GEMS Landfill in Gloucester Township, New Jersey. Throughout the five years of federal litigation, pleadings have been amended and new parties have been joined in an orderly process of case management. The State now seeks remedies under state and federal law, including the Comprehensive Environmental Response Compensation, and Liability Act ["CERCLA", also known as the "Superfund" statute], 42 U.S.C. § 9601 *et seq.*, and the litigation has grown to several hundred active parties. A more detailed case history appears in *State of New Jersey, Department of Environmental Protection v. Gloucester Environmental Management Services, Inc.*, 719 F.Supp. 325 (D.N.J.1989).

The GEMS Landfill is a Superfund site ranked twelfth on the EPA's National Priorities List.[5] Of the top twenty ranked Superfund sites in the nation, only the GEMS Landfill is shown as having a substantial remedial program in place,[6] thanks in part to ongoing remedial action being undertaken by a large group of the settling defendants and third-party defendants in

this case who have funded a State-approved Phase I settlement by creating a $32–million trust fund in 1989. The issues related to Phase II of remediation remain. The litigation continues, leading either to resolution of the remaining issues by a total or partial Phase II settlement and/or a trial.

This Superfund-site litigation is thus a complex multi-party hazardous waste case. Traditional notions of adversarial litigation, in which each party engages in its own pretrial discovery, motion practice, settlement discussions and trial preparation, could not serve the legitimate needs of the several hundred parties nor of judicial economy. By 1987, parties throughout the case recognized that the goal of a "just, speedy, and inexpensive determination of every action" under Rule 1, Fed.R.Civ.P., could not be achieved unless the case was streamlined and reorganized. In case management conferences the parties requested, and the court agreed, that a system of Liaison Groups, each headed by a Liaison Counsel selected by each Group, would be established for case management purposes.[7]

The Groups were established along functional lines, consisting of an Operators Group, a Generators Group, a Transporters Group, the Owner Group (consisting of only one "member", the Township of Gloucester), and eventually the Municipalities Group. These five defense groups each selected their own Liaison Counsel, and these selections were ratified in the Case Management Orders.[8] Changes in the identity of Liaison Counsel were also recognized by the court.[9] The case has been managed by the court through the panel of the six Liaison Counsel, consisting of the

niques, and Ogden Waste Removal, 8/20/90, $285.00 balance collectively.

4. Charles Crumbley, Inc., reported 2/14/90 as being in Chapter 11 Bankruptcy as of October 31, 1988; and Champion Auto Generator Service, Inc., reported 4/12/90 as continuing in Chapter 11 Bankruptcy, and as to which all proceedings were stayed by Order of the Honorable Stanley S. Brotman (filed Nov. 15, 1989). Further discussion appears in Part III.C, below.

5. 40 C.F.R. Part 300, App. B at 121 (1990).

6. *Id.*

7. *See* Case Management Order ("CMO") No. 2 (April 3, 1987), ¶¶ 2–5.

8. *See* CMO No. 2 (filed April 3, 1987) and CMO No. 3 (filed May 1, 1987), the latter designating the Wilson, Elser firm as Transporter Group Liaison Counsel in ¶ 29.

9. *See* CMO No. 9 (filed August 25, 1989) (recognizing new Liaison Counsel for Owner), ¶ 55(b).

five defense Liaison Counsel plus the Deputy Attorney General for the plaintiff State of New Jersey.

The roles of Liaison Counsel were circumscribed by the court, expressed in the Case Management Orders. Importantly, CMO No. 5 (March 31, 1988) recapitulated prior determinations and provided that Liaison Counsel had duties of coordinating the groups, conducting discovery and motion practice, and participating in case management decisions. Specifically, all parties then in the case or added to the case were to be assigned to the appropriate Liaison Group, and the parties were encouraged to participate in conferences, proceedings and motion practice through Liaison Counsel. (CMO No. 5, ¶¶ 1–2.) Liaison Counsel were required to maintain complete sets of pleadings, document depositories and other pretrial activities (*id.* ¶ 3). Motion practice was conducted through Liaison Counsel, and special provisions protected the rights of those not wishing to join in a common motion position (*id.* ¶¶ 5–9). Hundreds of hours of depositions were scheduled and conducted through Liaison Counsel, under the mechanism of CMO No. 5, ¶ 25 and CMO No. 10, ¶ 73 (filed October 26, 1989), accompanied on occasion by counsel for any party desiring to attend and participate in the deposition. Depositions were digested by Liaison Counsel, who maintain the transcripts in their document repositories (*id.* ¶ 3(d) & 24(c)).

When it became clear that Phase I settlement discussions were imminent, each Liaison Group was given the opportunity to select its own Settlement Counsel. (CMO No. 4, ¶ 49. filed February 3, 1988.) Each Group, as it turned out, selected its same Liaison Counsel to act as Settlement Counsel as well, and these choices were ratified by the court. Settlement discussions, involving hundreds of hours in the courthouse and many more outside, were largely conducted through Liaison Counsel, before breaking discussions down to the levels of individual parties and, upon occasion, insurance carriers.

Compensation of Liaison Counsel, the subject of this motion, was to be paid by the respective group members. This court provided that Liaison Counsel "shall be entitled to reasonable compensation and reimbursement of expenses for all administrative services required to be performed by this Order, equitably apportioned among members of the group benefitting from such services." (CMO No. 5, *supra,* ¶ 4.)

The amount of liaison compensation is determined by the group in order to achieve equitable apportionment among group members. If the group is unable to agree, or if members do not pay their fair shares, the court will resolve such disputes pursuant to CMO No. 5, ¶ 4, which also states:

> The compensation of Liaison Counsel in the first instance shall be resolved if possible by members of the group represented by such Liaison Counsel. In the event of any inability to resolve disputes respecting such compensation, the Court will set one or more dates for the resolution of such disputes.

The present motion invokes this mechanism for judicial intervention.

This language recognized that Liaison Counsel provide services of benefit to all group members. These services are largely "administrative" in nature, such as the coordination and communication functions mentioned above. The services extend beyond the merely ministerial, however, as Liaison Counsel acquire a sophistication in the case that is fully shared with the group members through regular communications. Liaison Counsel amass discovery, which is then summarized, chronicled and maintained for the benefit of each group member. Without Liaison Counsel, and without membership in a Liaison Group, each party in this case would have had the choice of participating fully in each relevant aspect, acquiring all knowledge and discovery through its own attorney at a cost of many tens of thousands of dollars, or alternatively remaining ignorant of its obligations and status in a case approaching trial where alleged liabilities may well exceed $50 million, exclusive of the treble-damage remedy sought by the State of New Jersey from non-participants in settlement.

With this background in mind, each of the above objections is next considered.

## III. DISCUSSION

### A. *Objection to Group Membership and Sharing Liaison Counsel Expenses*

■ The most fundamental objection in response to Liaison Counsel's motion asserts that a party cannot be compelled to join a Liaison Group nor to share in Group expenses. This position has been stated by several parties [10] and perhaps alluded to by others. No authority is cited for this objection, nor has *any* party filed a motion, at any time since 1987, to be relieved from the court-ordered placement into a Liaison Group. This issue is ripe for determination due to the refusal of payment by some members upon this ground.

This court has the clear authority to arrange parties into coordinated groups and to require parties to compensate Liaison Counsel for administrative services and expenditures on behalf of the group's members. In this multi-party hazardous waste case, the court has adopted the suggestions of many parties seeking such organization at the earliest case management conferences. This court has also followed the strong suggestions for complex case management through Liaison Counsel as set forth in the *Manual for Complex Litigation, Second* (1985) ["*MCL 2d*"].

In *MCL 2d* at § 20.22 the court's authority to assign parties to groups having similar characteristics is recognized:

In some cases the attorneys on their own coordinate their activities to eliminate any significant problems among themselves or to their clients, other counsel, and the court. More often, however, the court should itself institute special procedures under which the practices normally incident to individual representation are reshaped in the interests of economy and efficiency. Although details vary, the basic approach is to select and empower, by court order if necessary, one or more attorneys to act on behalf of other counsel and parties in handling particular aspects of the litigation.

Liaison Counsel fulfill these roles. The duties of Liaison Counsel, as stated in *MCL 2d* at § 20.221, are reflected in the definition appearing therein:

**Liaison counsel** is a term generally used to describe attorneys whose primary duties for the group involve essentially administrative matters, such as communications with other counsel and the court. Typically they receive various notices, orders, motions, and briefs on behalf of the group, and then make appropriate distributions within the group. They may initiate and convene meetings of the group, give notice of and report on major developments in the case, and otherwise aid in coordinating activities and positions. Such counsel may act for the group in managing document depositories and in resolving scheduling conflicts. An attorney with offices in the same locality as the court is usually selected as liaison counsel.

Placement into a Liaison Group may be required where it is reasonable to do so, in advancing the fair and efficient management of a complex multi-party case. The Federal Rules of Civil Procedure give the court wide discretion in matters of case management. For example, in complex cases, Fed.R.Civ.P. 16(c)(10) instructs the judge or magistrate to consider, in pretrial conferences:

the need for adopting special procedures for managing potentially difficult or protracted actions that may involve complex issues, multiple parties, difficult legal questions, or unusual proof problems.

Such "special procedures" can no doubt include the creation of liaison groups consisting of parties having allegedly similar connections to the litigation.

The creation of case management orders embracing discovery plans, as in the present case, arises from Rule 26(f), Fed.

---

**10.** Parties raising this objection include: Thermo–Mold Equipment and Supply Company; Mike Spano & Sons, Inc.; John Harrington; Atlas Environmental Company; and William Lawrenson, Sr. and Jr.

R.Civ.P., which is the discovery conference rule. Following a conference, the court enters an order "tentatively identifying the issues for discovery purposes, establishing a plan and schedule for discovery, setting limitations on discovery, if any; and determining such other matters, *including the allocation of expenses,* as are necessary for the proper management of discovery in the action," Rule 26(f), Fed.R.Civ.P. (emphasis added).

In the present case, this power was employed to manage discovery primarily through Liaison Counsel. The allocation of reasonable expenses arising from this special procedure is authorized in Rules 16(c)(10) and 26(f), above.

The allocation of liaison counsel expenses is also discussed in *MCL 2d* at § 20.223, which states:

> In all fairness, expenses incurred and fees earned by special counsel and committees should not be borne solely by their own clients, but rather should be shared equitably by all benefiting from their services and relieved from similar obligations. If possible, the terms and procedures for payment should be established by agreement among counsel. If a consensus cannot be reached, however, the judge has the power and duty to order fair reimbursement and compensation. Whether done by agreement or court order, these procedures should be established before substantial services are rendered and provision should be made for periodic billings during the litigation or for creation of a fund through advance assessments of members of the group. The agreement or order should provide that parties entering partial settlements make appropriate contributions with respect to services already rendered by designated counsel, and in some cases may appropriately require contributions from parties in later filed or assigned

cases who benefit from the work of special counsel. [Footnote omitted.]

This procedure, which is reflected in CMO No. 5, ¶ 4, *supra,* anticipates that such allocation will normally be done within the liaison group, in the first instance. If the group members are unable to agree, the court can make such apportionment as is fair, and can enforce the members' obligations to one another through collateral court orders. The same authority was recognized in *In re FTC Line of Business Report Litigation,* 626 F.2d 1022, 1027 (D.C.Cir.1980), and in *In re Air Crash Disaster of Florida Everglades,* 549 F.2d 1006 (5th Cir.1977).

■ For these reasons, this court rejects the threshold objection, and holds that it has power to place parties into appropriate groups and require group members to compensate and reimburse Liaison Counsel in an equitable manner. A party objecting to its membership in a group has the burden of demonstrating that such placement is unreasonable or that creation of such groups is an abuse of discretion, and none of the objectors has made such a showing.

B. *Objection Seeking More Detailed Accounting of Billing Information*

■ Several parties objected to the thoroughness of billing information supporting Liaison Counsel's fee application.[11] The original fee application did not include the detailed records of counsel's time and services, which are voluminous. In response to the objections to the application, this court ordered that the detailed billing information be made available to all group members for inspection at the Wilson, Elser office in Newark and at the office of Yampell & Kassel in Haddonfield. Several objectors inspected these records. There have been no further substantive objections to the billing information's sufficiency,[12] nor does any member dispute the

---

**11.** Parties raising this objection include Waste Management, Inc. and related parties, Continental Vanguard, Robert Hargrove Enterprises and William Castner, Atlantic Disposal Services, Richard S. Burns and Bill's Container Service,

Eastern Industrial Corp., and Daeche and Company, Inc.

**12.** Mr. Eron's letter of April 5, 1990, on behalf of Continental Vanguard, raises three concerns after inspecting the documents. First, Mr. Eron objects to the notation of confidentiality upon

hours and rates claimed for legal and paralegal services after having inspected the bills.

All underlying billing information has also been submitted to the court and inspected *in camera*. This information consists of the bills for liaison counsel services and disbursements underlying the present application: Invoice No. 16225 (2/28/89), No. 50520 (8/31/89), No. 59290 (12/18/89), and the bills sent by Liaison Counsel's firm to the private clients in this case for services and disbursements from June 30, 1987 through the end of 1989. These private clients are Manor Care, Inc. (and related companies Almo Anti–Pollution Service Corp. and Almo Tank Cleaning Services Corp.), and A.J. Mitchell and Waszen Container Service. This inspection addressed the particular concerns noted by several members, to assure that the underlying tasks were for Liaison Counsel services and not representation of private clients, to determine whether the time expended for Liaison services was reasonable, to determine whether the mix of attorney and paralegal staffing was appropriate, to examine billing rates and to review itemized common costs for which reimbursement is sought. These records have been carefully examined and are being filed under seal in the records of the Clerk.

The only accounting/paperwork objection requiring extended comment concerns whether Liaison Counsel is obligated to furnish a free copy of underlying billing information to each member from whom payment is sought. In the present case, Liaison Counsel refused to provide copies as a matter of course, but did make the materials available for inspection at two convenient sites and eventually offered to make copies upon request of any member and at the member's reasonable expense.

█ Although the relationship between Liaison Counsel and group members is not an attorney-client relationship,[13] the conduct of attorneys may nonetheless be guided by analogy to the Rules of Professional Conduct with respect to fees and billing arrangements. Billing information should be supplied by analogy to the requirements of RPC 1.4(a):

A lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information.

Similarly, by analogy to RPC 1.5(b), the attorney's fee should be discussed and communicated to group members:

Liaison Counsel should supply copies of the underlying billing data to each group member from which reimbursement is sought, and charge the expenses of such reproduction and mailing as necessary costs for reimbursement on a group-wide basis, as discussed in the text below.

the bills, to which Mr. Orr correctly responds that the bills are confidential only as to non-group members. Second, Mr. Eron objects to the notation that the bill was directed to a third party, Underwriters Adjusting Company; Mr. Orr has clarified that the notation was for bookkeeping purposes only within his firm, that none of this bill was sent to or paid by Underwriters Adjusting Company (which is the insurance carrier through which Wilson, Elser were retained to represent individual transporter clients), and that all services rendered on behalf of the individual clients were segregated for these billing purposes from the services rendered as Liaison Counsel. The billing notation listing "Underwriters Adjusting Company," while confusing at first impression, has been explained. It would be better practice in the future to use an account notation such as "Transporter Liaison Services" so that there can be no future misunderstanding, either within the firm or among group members. The third objection, that Mr. Eron wants a copy of the entire billing information, has been satisfied by Mr. Orr's offer to provide these voluminous copies at Mr. Eron's expense. In the future,

**13.** There is no attorney-client relationship because members do not "retain" the Liaison Counsel to represent them in the litigation. Each member remains separately represented by its individual attorney. The efforts of all the attorneys are coordinated through Liaison Counsel, whose services are principally administrative and communicative. Liaison Counsel also performs legal services benefitting all group members, such as attending and digesting depositions and document productions and participating in group-wide motion practice. Fundamentally, while Liaison Counsel perform legal services that individual members' attorneys would otherwise have to do, such services are on a group-wide basis without displacing the individual party's attorney-client relationship with counsel of its choice.

When a lawyer has not regularly represented the client, the basis or rate of the fee shall be communicated in writing to the client before or within a reasonable time after commencing representation.

These practices which govern attorney-client billing serve the useful purpose of avoiding misunderstandings and assuring the client of the basis for the billings. Applying these or similar requirements to the Liaison Counsel situation should also promote greater understanding of Liaison Counsel's services and fees.

In the future, all details of rate and billing information should be routinely furnished to each group member from whom reimbursement is sought. Liaison Counsel may be reimbursed for these copying fees as reproduction costs on a group-wide basis.[14]

I am satisfied for purposes of the present motion that each member has enjoyed sufficient notice and opportunity to review the detailed billing information, which has also been made available upon request to individual members, and that the objections of a few members to the initial accounting information have been overcome. No member has voiced objection to particular items of liaison services and common costs. This court's own review satisfies it that Liaison Counsel has appropriately accounted for the underlying services and costs, that such services were reasonable and conferred group-wide benefit.

█ I also find that the hourly rates billed by liaison counsel and his associates and paralegals are reasonable for such services, at the following hourly rates, indicating positions in firm and dates of admission to New Jersey Bar:

| | 1988 | 1989 |
|---|---|---|
| Partner '65 | $190 | $190 |
| Associate/Partner '82 | 135 | 135/165 |
| Associate '85 | 125 | 145–155 |
| Associate '82 | ——— | 135–165 |
| Paralegals | 50 | 50, 65 |

I find that tasking assignments were appropriate. Many tasks were performed by paralegals involving skills exceeding clerical and approaching legal. Most attorney work was performed by associates. The senior partner spent relatively little billable time performing these liaison services.

In conclusion, I agree with liaison counsel that reimbursement for the total fees and costs sought herein is appropriate, in the total sum of $171,399.92, less payments of $45,039.89, for a net amount due of $126,360.03 through 1989.

### C. *Objection that Members Unable to Pay should receive a Hardship Exemption*

Only two objections[15] to the proposed fees are based upon the explicit claim of inability to pay. One supposes that many other non-paying members who have not responded to this motion may share this claimed inability to pay. Liaison Counsel has sought this court's guidance on how to treat such situations.

Each non-defaulting party in this case, as in any other case, is expected and required to defend itself and to bear its own expenses. If there were no Liaison Counsel structure, parties would have to arrange to attend all court hearings and conferences, provide, obtain and analyze their own discovery, engage in motion practice and other trial preparation, and attend to all other litigation events. In a case of this magnitude, such expenses for each party could be enormous, and the party would have to decide whether to bear such transactional costs to the extent necessary to at least avoid defaulting in its obligation, or alternatively to default.

With the Liaison Counsel structure, and especially in a large group such as the Transporters, these costs are significantly

---

**14.** Such costs of reproduction will not be great, compared with the interest in assuring accurate accounting and billing. In the present situation, this would have involved fewer than 7,500 pages (123 sets of 60 copies), covering the fees and costs of two years of services.

**15.** These objections were made on behalf of J.F. Horn & Sons, William Lawrenson, Sr. & Jr., and John Harrington. Two other members, as noted above in note 4, are debtors under Chapter 11 reorganization from which no fees can be sought or paid without Bankruptcy Court approval under 11 U.S.C. § 327.

reduced while the quality of services for the individual group member is probably enhanced through Liaison Counsel's efforts, as discussed above.

Where a party declares that it is unable to pay for Liaison Counsel services, what should be done? To sever such parties from the Liaison Group due to non-payment could lead to administrative havoc. Whether the party has paid its fees or not, it remains a party in this complex case, entitled to participate as best it can to defend itself and to avoid default. To keep the non-paying party in the Group benefits the indigent party by providing something of a "free ride" to the detriment of the paying members and Liaison Counsel himself or herself. On the other hand, to require Liaison Counsel to perform services benefitting the indigent members can result in counsel being unpaid for costs and services, unless the indigent party's share is redistributed to the other members.

■■■ If a party is indigent, it is unable to pay even the comparatively slight Liaison fees, and further uncompensated efforts by Liaison Counsel on its behalf should not be required. The burden should be placed upon the party claiming inability to pay the Liaison Counsel fees to come forward and demonstrate its indigency.[16] Rather than prescribing standards for such indigency, I will leave it to Liaison Counsel, in consultation with the group, to set a reasonable standard for inability to pay and to establish a process in which to receive and assess such claims of indigency, upon two conditions.

■■ First, when a party seeks to be excused from paying such group fees due to inability to pay, it is consenting to be deleted from the mailing list for the group so that it will not receive regular communications from Liaison Counsel. Upon recognition of indigency status, the party becomes an inactive member of the group, for which no further services will be performed by Liaison Counsel. This inactive status is not a default, but it may lead to default in the

litigation if the party does not protect its own interests.

■■ Second, if Liaison Counsel approves such indigency status, the indigent member's share of costs is allocated among all non-indigent members. The indigent member will not be counted as a "share" for the per capita assessment of group costs.

■■ Likewise, members which are debtors in bankruptcy proceedings may be deemed indigent for present purposes without further application. It would be an unfair imposition upon Liaison Counsel to require him to seek relief in the bankruptcy court from the automatic stay in order to collect the relatively small amounts at issue here. Such debtors will likewise not be counted as owing a "share" for purposes of per capita assessment.

Liaison Counsel will maintain accurate records of all applications for indigent member status and bankruptcy status, the determination thereof, and the resulting reduction of the overall number of member-shares for these reasons.

This solution ends the "free ride" for indigent parties while achieving reimbursement for Liaison Counsel's services. This is not unfair to the viable members of the group, because the viable members are likely to be the ones that have benefitted most from Liaison Counsel services, in comparison with fringe parties of doubtful viability. Indigent parties, being judgment proof and having nothing to lose by not defending, do not derive much economic benefit from Liaison Counsel's services, as a practical matter. An indigent party would be indifferent to judgment and presumably non-responsive to the litigation. Whether or not there was a Liaison Counsel system, the indigent member could have done little to represent its own interests, while the viable members would have derived substantial economic benefit from the fact that Liaison Counsel has spared them much work they would otherwise do, at a

---

**16.** If a member does not claim indigent member status and ignores its payment obligations, it will be subject to a judgment entered against it in favor of Liaison Counsel. The procedure for obtaining such judgment from the District Court is discussed in Part subpart G, below.

fraction of the expense they would otherwise incur. Therefore, it is equitable to shift the indigent party shortfall to the non-indigent members, rather than having Liaison Counsel absorb this expense.

In summary, no determination is made in this Opinion concerning the parties claiming inability to pay. That is left for Liaison Counsel, who will consult with the group, establish a standard for proving inability to pay and a process in which to receive and determine such claims, while keeping accurate records of this process. These records will establish the identities of indigent and bankrupt members which will assume inactive status requiring no further efforts by Liaison Counsel on their behalf.

D. *Objection that Members Having Common Ownership With Other Member Companies and Represented by a Single Attorney Should not be Required to Pay a Full Per Capita Share*

The problem of multiple parties having common ownership, represented by a single attorney, is next considered. Under the Transporters Group plan, each party was assessed a per capita share. The objecting parties [17] claim that this is unfair because these multiple parties are essentially only one party, having one owner and one attorney.

It is rather incredible that the multiple related party entities filing objections have not even collectively paid a *single* per capita share of the Liaison Counsel fees.[18] This non-payment results in the biggest "free ride" for viable parties of which this court is aware.

Where members have common ownership and a single attorney, the Liaison Counsel's efforts per common member may be somewhat reduced. A single phone call or mailing to the one attorney covers the multiple parties. On the other hand, the related companies may not have enjoyed common ownership when the transportation of hazardous wastes allegedly occurred. At the least, the companies chose the benefits flowing from separate business forms, such as separate incorporations. Multiple names and records appear in the case and Liaison Counsel's efforts may rise to the level of serving distinct parties.

On balance, however, the allocation of a per capita share for each of the jointly owned parties is excessive. Economies can surely be realized through the joint representation of commonly owned companies by the single counsel. It would also not be fair to consider the related parties as a single entity for these purposes, because they are not.

It would be equitable to treat each related party as a one-half per capita share, recognizing these economies. In the present situation,[19] the nine Waste Management companies would each bear *one-half* share, for a total of 4.5 shares. The four Lombardi companies would each bear one-half share, for a total of 2.0 shares. Similarly, the Globe/Ogden/Waste Techniques companies would bear a total of 1.5 shares. These allocated shares shall be the basis for present payments [20] and shall

---

**17.** These objections come from counsel for the nine Waste Management parties [consisting of the parent defendant Waste Management, Inc., and eight subsidiary defendants, Waste Automation, Instant Disposal Services, SCA Services of Pennsylvania, O'Connor Corporation, Waste Disposal (SCA Services), Penn Sanitation, Tri–County Hauling and Schiavo Brothers]; and from counsel for the four Lombardi parties (consisting of Five County Carting, Inc., Delaware Valley Refuse Container Co., Inc., Frank Sargent, Inc., and Kaut & Kaut, Inc., all of which have the same president and owner, Paul Lombardi); and from the three Globe/Ogden/Waste Techniques companies. (Globe and Waste Techniques are corporations with common ownership and management, and Globe acquired Ogden in 1981–1982, at which time Ogden ceased doing business.)

**18.** The nine Waste Management companies have paid a total of $500.00 (by Waste Management, Inc.); the four Lombardi companies have paid a total of $1,500.00 (by Five County Carting, Inc.); and the three Globe/Ogden/Waste Techniques companies have paid a total of $2,715.00 (according to Mr. Michelman's letters of Mar. 29, 1990, May 8, 1990, and August 20, 1990).

**19.** *See* note 17, above.

**20.** The Waste Management companies' 4.5 shares yield a total of $13,500.00, of which $500.00 has been paid, *see* note 18. The Lombardi companies' 2.0 shares yield a total of $6,000.00, of which $1,500.00 has been paid. The Globe/Ogden/Waste Techniques compa-

be used in the future billings.[21]

The billing plan for the Liaison Group should also contain a procedure for other entities to qualify for joint ownership/single representation status and a one-half per capita share, to be applied to future billings. The total number of shares for purposes of per capita distribution of group fees and costs will be reduced accordingly.[22]

E. *Objection that Members added to Group After Liaison Counsel's Selection in 1987 should not be Required to Pay a Full Per Capita Share*

An objection has been raised to payment of these fees and expenses incurred on behalf of the group before the objecting member was joined.[23] The proposed per capita share is equal for all group members, regardless when they were joined during the 1988–89 billing period. An objector argues that "basic fairness precludes charging a party any fees or expenses incurred by liaison counsel prior to that party being joined in the suit." [24]

The size of the Transporter Group increased during the two years for which reimbursement is sought, as parties were added to the case. The services of Liaison Counsel also increased as members were added. For a short billing period, it makes sense to engage in the simplifying assumption of distributing fees and costs evenly among all parties who were members at any time in the period. In the present case, a party becomes a group member when it is served with the pleading alleging

transporter status. This assumption of equality rests upon the sound reasoning that even the newer members benefit from the accumulation of material and work of Liaison Counsel in the recent past prior to the new parties being joined. See Affidavit of James C. Orr, ¶ 10. An equitable fee plan recognizes that members pay in proportion to the benefit conferred by Liaison Counsel's services.

The reimbursement scheme is governed by the overall precept, in CMO No. 5, ¶ 4, *supra*, that Liaison Counsel "shall be entitled to reasonable compensation and reimbursement for expenses for all administrative services required to be performed by this Order, equitably apportioned among members of the group benefitting from such services." It is equitable to recognize the benefit conferred upon new parties by Liaison Counsel's previous efforts, especially when those efforts have been recent. The more recent the effort, the greater the likelihood that the service involves items of current concern to all members, whether old or new.

It becomes less equitable to expect a new party to bear a full share for services rendered in the distant past, which were presumably of greater benefit to the old members. In the present case, Liaison Counsel has issued three invoices for the two year period:

| | | |
|---|---|---|
| 1st Invoice | 3/1/88—12/31/88 | $26,326.36 |
| 2nd Invoice | 1/1/89—7/31/89 | 67,576.95 |
| 3rd Invoice | 8/1/89—11/30/89 | 83,036.39 |

It can be seen that the 1988 services were less time-intensive than the 1989 services. In this fee application, 15.36% of the com-

---

nies' 1.5 shares yield a total of $4,500.00 of which $2,715.00 has been paid.

**21.** Similarly, the companies represented by Liaison Counsel—Manor Care, Inc., Almo Anti–Pollution Service Corp. and Almo Tank Cleaning Services Corp.—are related entities having joint ownership and single representation by counsel, *see* Affidavit of James Orr, filed Mar. 29, 1990 at ¶ 5. These three companies would have qualified for a reduction to 1.5 shares. They have each paid a full $3,000 share already, in addition to having "fronted" a substantial sum for counsel's services and disbursements from July 1987 through March 1988, as noted above. For reasons discussed in Part III.G.3 below, the Manor/Almo companies will receive a credit

for past payments and will be exempted from contributing further Liaison Group fees and costs.

**22.** This savings for common ownership parties would appear be $24,000.00 (consisting of the $13,500.00 savings for the Waste Management parties and $6,000.00 savings for the Lombardi parties, and $4,500.00 savings for the Globe/Ogden/Waste Techniques companies).

**23.** This objection was made on behalf of Daeche & Company and Thermo–Kold Equipment & Supply.

**24.** Letter of Robert A. Muccilli, Esquire, dated Feb. 21, 1990.

pensation is for 1988, while 84.64% is for 1989.

A permissible rule of thumb would require equal sharing of costs and fees incurred by the group within each calendar year, among all parties that were members by the end of the year. This recognizes that such services have benefitted the group's members throughout the year, and that it would be inequitable to have older members bear all the burden for services benefitting newer members later in the year. This also recognizes that the future billing base will be spread among the future new members, resulting in some savings to all other members at that time.[25]

It appears that some recalculation of shares will be necessary, so that a new member will bear its full share only for common services and costs incurred beginning with the same calendar year in which the new party was joined. Under this proposal, members added in 1989 would not share 1988's group expenses. In future billings, members added in 1990 would not share 1988 or 1989 expenses, and so forth. Unless the group decides upon a more equitable course of action, this provision for new members should be made part of the Liaison Group's fee plan and applied to present and future billings. This means that the share for a new member in 1989 would not include 1988 fees, which would be a 15.36% reduction of the 1989 new member's share compared with 1988 members' shares. Thus, while the full share of a 1988 member would be $3,000.00, the reduced share of a "new" (1989) member would be $3,000 less 15.36%, which equals $2,539.20. New (1989) parties who paid the full share should receive a credit against future billings.

F. *Objection that Members Believing Themselves not to be Liable in the Underlying Litigation should not be Required to Pay any Share*

The final objection also merits the least discussion. Some members have apparently refused to pay group expenses because they believe themselves not to be liable in this Superfund case.[26] The responsibility for sharing liaison group expenses does not depend upon a finding of the member's liability in the underlying case. Some group members may eventually be exonerated from liability at trial, while one suspects many others will join (or have joined) in a compromise settlement in which liability is not determined. Yet all members have benefitted from the liaison group services in defending against plaintiff's claims.

The collection of liaison expenses is not the vehicle for adjudicating liability in the underlying litigation. Such a determination can only be made in summary judgment motion practice or trial.

Even if one accepted an objector's premise of non-liability, it is not inequitable for that member to bear its own share of litigation costs. Under the "American Rule" the fact remains that costs of litigation in the American system are borne by each party, win or lose, with exceptions only for fee-shifting statutes. *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 247, 95 S.Ct. 1612, 1616–17, 44 L.Ed.2d 141 (1975). Such fee-shifting provisions may permit the successful party to obtain reimbursement for fees and expenses under provisions of Rule 11, Fed.R.Civ.P., or 28 U.S.C. § 1927. No reason is apparent why a party ultimately adjudged non-liable could not seek to recoup its counsel fees, including Liaison Counsel fees, from the party that joined them in violation of Rule 11 or section 1927, *supra.* In the absence of such an exceptional situation, however, there will be no shifting of fees.

Until a party is dismissed from the litigation, or is found to be indigent or bankrupt, however, it continues to have the duty of paying its fair share of Liaison Counsel

**25.** The assumption of calendar year benefit does not mean that Liaison Counsel can render only one billing statement per year. Interim bills can be rendered and paid on account, subject to annual accounting and adjustment if new parties are added.

**26.** This objection is raised by members John Harrington, Thermo–Kold Equipment and Supply, Tri–County Disposal, Richard S. Burns, and Bill's Container Service, among others.

fees. The court must reject the premise that a party to this litigation is immune from paying its share of Liaison Counsel fees accruing prior to that party's dismissal.

G. *Summary of Procedures for Recalculation of Shares and for Obtaining Payment or Judgment for Non–Payment, and for Future Billings*

For reasons expressed above, the court will grant the motion of Liaison Counsel for the Transporters Group to compel delinquent defendant and third-party defendant Members to satisfy the common fees and expenses of Liaison Counsel incurred on behalf of the Group. The following procedures will be used to reformulate certain members' obligations in accordance with the provisions of this Opinion, then to set forth any unpaid obligation for these fees in an Order compelling payment, and then reducing the Order to an actual Judgment in the event of non-payment of fees for the underlying period through December 31, 1989. These procedures will provide for a streamlined payment mechanism for the pre–1990 fees at issue here. The 1990 billings will be computed according to these same principles.

1. Procedure for Fees through December 31, 1989.

Each full share for fees of each Transporter Group member through December 31, 1989, will be $3,000.00, unless the party was not a member in 1988, in which case its share will be $2,539.20 (subpart E, above).

Recalculation is necessary to adjust the shares of "joint ownership/single representation" parties (subpart D, above). Bankrupt members should be deleted (in accordance with subpart C) and they shall assume inactive status. Liaison Counsel shall thereafter, and within twenty (20) days of today's date, submit a proposed Order for Payment to compel each listed delinquent party to make payment of the indicated unpaid fees through December 31, 1989 that are within the present application.[27]

Upon entry of the Order for Payment, the delinquent parties will have thirty (30) days to make full payment or to apply Liaison Counsel within the group for indigent status (subpart C, above). Members qualifying for indigent status will be excused from payment. If a member fails to timely respond to the Order for Payment by payment or by seeking and obtaining indigent status within the group, the member is subject to entry of judgment. In the event of non-payment, Liaison Counsel may then apply, upon notice of motion before the Honorable Stanley S. Brotman, for entry of a Judgment in favor of Liaison Counsel and against the delinquent member for the amount of that member's delinquency.

2. Procedure for Fees after January 1, 1990.

The billings for 1990 Transporter Group services and costs may also go forward after entry of the Order for Payment above. These 1990 fees were not the subject of the present motion, but the procedures adopted herein will govern the 1990 fees and subsequent years, unless modified by the Group or by order of the court.

In the unlikely event that there remains a shortfall for pre–1990 fees and costs (that is, that the total shares paid or payable by viable parties does not exceed the pre–1990 billings of $177,399.92), then such a shortfall may be added to the group costs and fees for 1990.

The reasonable 1990 costs and fees, together with the pre–1990 shortfall, if any, shall be assessed per capita to all 1990 members according to their respective shares. Of course, the total number of "shares" for 1990 will consist of the number of viable members as of the end of 1990, excluding for bankrupt and indigent members, adjusted for joint ownership/single representation status as applicable, and excluding the Manor/Almo parties.

---

**27.** The Order for Payment shall list each delinquent party by name, and its base share ($3,000 for "old," and $2,539.20 for "new"), any adjustment for multiple party status, the amount paid on account, and the amount due.

3. Shares Attributable to Manor/Almo Parties.

 As noted above,[28] Manor Care, Inc., Almo Anti–Pollution Service Corp., and Almo Tank Cleaning Services Corp. are related entities having joint ownership and represented by Liaison Counsel. The Manor/Almo companies paid about $65,000 in fees and costs to the Wilson, Elser firm after Mr. Orr became Liaison Counsel in July, 1987, and before the present billing for Liaison Group fees began in March, 1988.[29] These three entities, as noted,[30] have also each paid full shares of $3,000.00 each to Liaison Counsel for the post-March 1988 period. At the court's request, Mr. Orr submitted confidential copies of all bills rendered by his firm to his clients[31] in this case that could overlap the group fees sought in this motion. These client billing statements have also been inspected *in camera.*

Inspection of these billing statements reveals two important facts. First, of the fees and costs paid by Manor/Almo for July 1987 through March 1988, at least one half of the $65,000 was directly attributable to Liaison Counsel services and costs on behalf of the group.[32] Second, the services and costs for which group reimbursement is sought in this motion are indeed attributable to liaison group activities and not to efforts on behalf of the private clients, which have been billed for all non-liaison services. Counsel has made a careful and reasonable separation of activities for which reimbursement is sought here. If anything, these billing records reflect caution in billings to the group, in recognition that substantial services are of direct benefit to the individual client. Counsel has exercised appropriate discretion in dividing time, essentially billing the group only for the services that would not have been performed but for counsel's position as Liaison Counsel.

Under these circumstances, it would be inequitable to have the Manor/Almo parties[33] bear more than their fair share of liaison fees. The three Manor/Almo companies should receive a substantial credit for past overpayments before being again obligated to contribute their share. The amount of such credit may be as much as $32,500, which estimates the "front payment" for pre-March 1988 group services. Manor/Almo will not be required to bear their 1.5 shares of liaison group fees and costs until their $32,500 credit is used up. As a practical matter, this also means that Manor/Almo will enjoy liaison services for the rest of this case, for which they have prepaid.[34]

4. Accounting for Excessive Reimbursement.

If each group member paid the $3,000 per capita assessment, the fund raised would exceed the costs and fees presently

28. *See* p. 3 above, and n. 21 above.

29. This has been confirmed by the court's *in camera* inspection of counsel's invoices to Manor/Almo, specifically Invoice No. 44548 (Dec. 31, 1987) and Invoice No. 45875 (Mar. 31, 1988).

30. *See* n. 21, above.

31. These clients include the Manor/Almo companies and A.J. Mitchell and Waszen Container Service.

32. The *in camera* inspection focused on the itemized services for which at least one hour was listed, comprising 80–90% of the total hours. Most of these services concerned liaison group activities, such as conferences with other liaison group representatives, organizing the group, attending court conferences as liaison counsel, handling motion practice for the group, researching claims against other groups, organizing and indexing group documents. Meetings with clients, discovery practice for clients and research pertaining to the clients consume a distinct minority of hours.

33. This determination does not affect the other clients—A.J. Mitchell and Waszen Container Service—which are not alleged to have common ownership with the Manor/Almo companies.

34. This result is not only obvious but also fair. It recognizes that when a party agrees to have its attorney serve as a liaison counsel and initially pay its attorney's costs and fees for services in organizing the group, these important efforts in support of the self-organization of complex litigation for the benefit of all group members will be recognized in the allocation of group fees.

sought.[35] The number of viable parties may be less than half this number, and adjustments for common ownership parties will reduce the number of shares even further. Until the hardship/bankruptcy exemptions and common ownership situations are figured, there is no way of knowing whether shares of $3,000 among viable parties would produce excess reimbursement. If it does, the payments shall be made and credited against subsequent billing for 1990 and 1991. Liaison Counsel shall fully and carefully account for each member's share, payment, and amount of overpayment if any. If the fund thus created exceeds group fees for the course of this litigation, which is unlikely but possible, the excess shall be refunded to the members in accordance with their account status.

This funding mechanism requires competent bookkeeping by liaison counsel and sharing of information with the group. These procedures provide for reasonable reimbursement of such liaison fees by members benefitting from such services, recognize and excuse indigent and bankrupt parties, allow for savings for common-ownership, jointly represented parties, eliminate the risk of underpayment, provide for entry of judgment against delinquent non-indigent members, and hold liaison counsel to carefully account for all professional efforts and costs expended on behalf of the group.

The accompanying Order is entered.

---

**35.** 137 members paying $3,000 each would yield $411,000, which is more than two times the sum of $176,939.90 at issue.