(No. 72759.—

CIRRO WRECKING COMPANY *et al.*, Appellees, v. ANTHONY ROPPOLO *et al.*, Appellants.

*Opinion filed October 22, 1992.*

BILANDIC, J., took no part.

Andrew M. Raucci, of Kusper & Raucci, Chrtd., of Chicago, for appellants.

Arthur R. Ehrlich and Gerald A. Goldman, of Goldman & Marcus, of Chicago, for appellees.

JUSTICE FREEMAN delivered the opinion of the court:

This appeal stems from the razing of the Henry W. Rincker House (Rincker House), a Chicago historical landmark, by Cirro Wrecking Company (Cirro Wrecking) at the direction of Anthony Roppolo, the owner of the property on which the structure stood. In a suit filed by Cirro Wrecking and its owner, Lela Cirrincione, it was alleged that Roppolo and Rizzi Excavating Company (Rizzi Excavating), an agent of Roppolo, conspired to keep the landmark designation secret in order to accomplish the demolition. Pursuant to a motion *in limine*, the trial judge barred Cirrincione from denying that she was aware of the landmark designation as of the time of the demolition. The trial judge ultimately granted a directed verdict (Ill. Rev. Stat. 1987, ch. 110, par. 2—1202) in favor of Roppolo and Rizzi Excavating after denying a motion by Cirro Wrecking and Cirrincione to amend their complaint so that it would conform to proof of a promise made by Roppolo to retain and preserve the Rincker House.

The appellate court reversed and remanded the matter for a new trial (No. 1—89—0027 (unpublished order under Supreme Court Rule 23)) but concluded that the trial judge did not abuse his discretion in disallowing amendment of the complaint.

We granted leave to appeal (134 Ill. 2d R. 315(a)) and now affirm in part and reverse in part.

## BACKGROUND

The circumstances which doomed the Rincker House are set out in some detail in *City of Chicago v. Roppolo* (1983), 113 Ill. App. 3d 602, a case involving the same events and parties before this court. We direct attention to that factual account and repeat here, in general fashion, only that necessary to consideration of the issues presented.

Henry W. Rincker's two-story, frame farmhouse occupied a distinguished position in the history of Chicago architecture. One of the, then, eight structures in Illinois built in the architectural style known as "carpenter's Gothic," the house was the second oldest in the city. It was, perhaps, the first structure having a stone foundation to be built by the efficient method of "balloon frame" construction, utilizing standard lumber sizes, originally developed in the Chicago area.

In March 1978, with the intention of eventually constructing a shopping center and condominium housing units, Roppolo purchased acreage on which the Rincker House stood. Within weeks, Roppolo engaged Joseph Romano to demolish the house. The application for the demolition permit showed the address of the house as 6366 N. Milwaukee Avenue. That application was denied.

Proceedings to have the Rincker House declared a landmark by the Commission on Chicago Historical and Architectural Landmarks (Landmark Commission) were begun in June 1978. Roppolo was represented by an attorney in those proceedings. Nevertheless, in April 1979, Roppolo, through Romano, again sought a permit to demolish the house.

Again unsuccessful in securing a right to demolish the property, Roppolo applied, in February 1980, for a zoning amendment to allow him to develop the acreage as he had intended. Following hearings, the Chicago plan

commission acceded to Roppolo's request, granting a modified amendment based on Roppolo's commitment to retain and preserve the Rincker House. Roppolo promised to move the house to another part of the property and to reconstruct and restore it at the direction of the Landmark Commission. That effort would have entailed considerable effort and expense for, although the Rincker House had been occupied when Roppolo purchased the acreage, a fire had ravaged the roof, upper floor, and interior of the house. In any event, Roppolo agreed that, when complete, the development would be known as "Landmark Square."

Roppolo, however, persisted in efforts to acquire a permit to demolish the Rincker House. He contacted Mario Rizzi of Rizzi Excavating to inquire of various demolition contractors whether any of them would be willing to apply for such a permit. Rizzi contacted Cirrincione. Cirrincione agreed to undertake the effort to acquire a permit on the condition that, if granted, Cirro Wrecking would be given the demolition contract.

On July 30, 1980, Cirrincione initiated efforts to secure a demolition permit, using the 6366 N. Milwaukee Avenue address for the Rincker House. Later, on August 20, 1980, while taking a photograph to accompany the application for the permit, she discovered that the address number appeared out of sequence. Recognizing that address numbers should increase to the north, Cirrincione observed that other structures on the acreage to the south of the structure had higher numbers. When she asked Roppolo what number to use on the application for the demolition permit, he directed her to use the 6366 N. Milwaukee Avenue address and provided her with a legal description.

Cirrincione continued to seek the various permits and approvals necessary to acquire the right to demolish the structure. At the city's map department, she was in-

formed that the 6366 N. Milwaukee Avenue address was not, in fact, the correct address for the Rincker House. Accordingly, based on the legal description given to Cirrincione by Roppolo, a new house number certificate for the structure, bearing the address 6384 N. Milwaukee Avenue, was issued.

The fate of the Rincker House was sealed. With the application for the demolition permit, containing the corrected address, and other relevant documents in hand, Cirrincione obtained approval of the city's demolition department. She proceeded to the permit control desk where the address of the structure, as corrected, was checked against computer records to insure that no landmark would be affected by the permit. When no landmark status was indicated for the 6384 N. Milwaukee address, the permit to demolish the structure was automatically printed. The Rincker House was demolished five days later.

### The Lawsuits

The city and a class comprised of all of its citizens subsequently filed an action against Roppolo, Cirro Wrecking, Cirrincione, and the bank holding title to the property in a land trust, seeking imposition of a constructive trust. The action, grounded on allegations of fraud, sought to prevent Roppolo's unjust enrichment resulting from the savings to him in restoration costs occasioned by the demolition. Following a bench trial, defendants were found not guilty of any fraudulent conduct which would support the imposition of a constructive trust.

The appellate court, with one justice dissenting, reversed the judgment as to Roppolo and the bank, concluding that Roppolo's conduct amounted to actionable fraud in view of his commitment to move, reconstruct, and restore the Rincker House. (*City of Chicago v. Rop-*

*polo*, 113 Ill. App. 3d at 612-13.) That portion of the case was remanded for retrial.

The court also criticized Cirrincione for her role in the demolition. In rejecting Roppolo's argument that the city should be estopped in its action against him because it had issued the demolition permit, the court noted that it was satisfied that Cirrincione, as an agent of Roppolo, knew of the landmark designation at the time she processed the application. (*City of Chicago v. Roppolo*, 113 Ill. App. 3d at 616-17.) The court also referred to evidence indicating Cirrincione had inspected the house and had noted, in a telephone conversation with an electric utility company employee the day after the permit was issued, the existence of posted signs indicating the landmark status. (*City of Chicago v. Roppolo*, 113 Ill. App. 3d at 616.) However, because the court concluded Cirrincione was unaware of Roppolo's obligation to move, reconstruct, and restore the Rincker House, the court determined Cirrincione's knowledge was immaterial. The court therefore affirmed the trial judge's ruling that neither Cirrincione nor Cirro Wrecking was guilty of either fraud or constructive fraud. *City of Chicago v. Roppolo*, 113 Ill. App. 3d at 617.

Subsequent to the termination of the city's action in the circuit court, Cirro Wrecking and Cirrincione (plaintiffs) filed the present action against Roppolo, the bank, and Rizzi Excavating (defendants). In their amended complaint, plaintiffs alleged that defendants never informed them of the landmark status of the Rincker House. Plaintiffs alleged that the existence of the landmark designation was a material fact underlying their agreement with defendants to process the application for the demolition permit and to undertake the demolition contract. In addition, the application for a demolition permit signed by Roppolo contained a certification that all work under the permit would conform to the Chicago

Municipal Code. Defendants' failure to inform plaintiffs of the landmark status in light of those facts, plaintiffs asserted, constituted the breach of a duty owed to them. Plaintiffs sought damages including amounts for loss of business due to adverse publicity and attorney fees incurred in defending various suits arising from the demolition.

Prior to trial, defendants moved to bar plaintiffs from eliciting any testimony from Cirrincione to establish that she was unaware of the landmark status of the Rincker House when it was demolished. Citing the appellate court's conclusion in *City of Chicago v. Roppolo* that Cirrincione had such knowledge, defendants argued the doctrine of collateral estoppel precluded plaintiffs from relitigating the issue.

In turn, plaintiffs filed a motion for partial summary judgment, also grounded upon the appellate court's decision in *City of Chicago v. Roppolo*, arguing that the conclusion reached by the court that Roppolo committed fraud in concealing his obligation to move, reconstruct, and restore the Rincker House established defendants' liability. Relying on that same conclusion, plaintiffs also sought an order precluding Roppolo from denying that he falsely led plaintiffs to believe he had a right to a demolition permit.

Both of plaintiffs' motions were denied. However, the trial judge granted defendants' motion to preclude Cirrincione from testifying that she did not know of the landmark designation of the Rincker House. The matter proceeded to trial before a jury. Significantly, the evidence presented included a joint stipulation, acknowledging Roppolo's commitment to move, reconstruct, and restore the Rincker House at the direction of the Landmark Commission.

At the close of plaintiffs' case, defendants presented a written motion for a directed verdict. Plaintiffs then

orally moved to amend the complaint to include additional allegations of fraud to conform with proof of Roppolo's commitment regarding the Rincker House as established by the stipulation. Plaintiffs' motion was denied, and the trial judge granted a directed verdict in defendants' favor. Plaintiffs appealed.

In a unanimous written order, the appellate court reversed and remanded the matter for a new trial. The court stated that the conclusion in *City of Chicago v. Roppolo* regarding Cirrincione's knowledge of the status of the Rincker House was not material to the issue of whether plaintiffs knew of Roppolo's commitment to move, restore, and reconstruct the house. The court therefore reversed the order of the circuit court precluding Cirrincione's testimony regarding her knowledge of the landmark status of the Rincker House and the directed verdict in defendants' favor. However, the order affirmed the rulings denying plaintiffs' motion *in limine*, motion for partial summary judgment, and motion to conform the pleadings to the proof.

## DISCUSSION

Initially, defendants challenge the validity of the appellate court's order reversing and remanding the matter on the ground that only two of the three justices who considered the appeal were actually in office at the time the order was entered. Defendants observe that the resignation from the court of Michel A. Coccia, one of the two concurring justices, became effective on August 1, 1991. However, defendants note, the order bears a stamp of the appellate court clerk's office indicating it was entered on August 6, 1991.

Defendants' argument turns on the recognition that the order is a judgment (134 Ill. 2d R. 2(b)(2)) and that judgments are, generally, effective as of the date of filing (see 134 Ill. 2d R. 272). Because the effective date of

Justice Coccia's resignation had passed when the order was filed, the court was represented by less than a full panel and was, defendants contend, therefore without legal authority to act. Defendants have drawn attention to several cases which stand, generally, for the proposition that once a judge has retired, resigned, or otherwise vacated office, he is divested of all authority to perform any judicial function.

The cases cited by defendants, however, are of little help in deciding the issue presented here because each involves a decision by a single judge in the performance of a trial court's business after his vacation of office. (*Waite v. People ex rel. Smith* (1907), 228 Ill. 173 (holding that a trial judge's failure to sign a judgment order could not be cured by a subsequent order allowing the attachment of his signature six months after the expiration of his term); *Broder v. Conklin* (1893), 98 Cal. 360, 33 P. 211 (holding that a signed "final" judgment received for filing by the court clerk after the expiration of the trial judge's term had no legal effect where a previous order on which that judgment was based indicated the judgment was not, in fact, a final determination); *Dawson v. Wright* (1955), 234 Ind. 626, 129 N.E.2d 796 (holding that the death of a trial judge, prior to his determination of facts and conclusions of law, necessitated a new trial); *Cain v. Libby* (1884), 32 Minn. 491, 21 N.W. 739 (holding that a trial judge's failure to render judgment following trial until after the expiration of his term had no legal effect); *State v. Dowdell* (1983), 55 Md. App. 512, 464 A.2d 1089 (holding that the failure to deliver a signed order of a trial judge to the court clerk for filing until after the judge's retirement defeated any legal effect of the order).) Those cases serve only to illustrate that, like any trial court having original jurisdiction, the judicial authority of the circuit court to render a final judgment rests with the trial judge in the proper

exercise of duties during the pendency of his office. Ill. Const. 1970, art. VI, §§1, 9; see *People ex rel. Schwartz v. Fagerholm* (1959), 17 Ill. 2d 131.

We note, in that regard, that where the trial judge "requires the submission of a form of written judgment to be signed by him, the clerk shall make a notation to that effect and the judgment becomes final only when the signed judgment is filed" with the clerk. (134 Ill. 2d R. 272.) Until that time, the judgment remains pending and subject to the trial judge's revisions. (See *In re Marriage of Dwan* (1982), 108 Ill. App. 3d 808.) The actual entry of the judgment by the clerk, however, is but a ministerial function and does not affect the validity of the judgment. (*In re Marriage of Garlinski* (1981), 99 Ill. App. 3d 107.) Thus, a judgment otherwise properly rendered during the pendency of a judge's term is valid even though it is actually entered by the clerk following the trial judge's vacation of office. That must be so because the judicial authority reposed in a trial judge in the proper functioning of his office in rendering judgment cannot be dependent upon the ministerial function of the court's clerk in recording that fact. (*In re Estate of Young* (1953), 414 Ill. 525.) It must also follow that, because the judicial authority is exercised exclusively by the trial judge during the pendency of his office, that authority ceases when the office is vacated.

The judicial authority of the appellate court, however, is distinguishable. The appellate court is organized into divisions, each individually representing the court. (Ill. Const. 1970, art. VI, §5; 47 Ill. App. 3d R. 1(1).) Each division is comprised of, at least, three judges. (Ill. Const. 1970, art. VI, §5; Ill. Rev. Stat. 1987, ch. 37, par. 25; 134 Ill. 2d Rules 22(a), (b).) Although the supreme court rules and the administrative rules for the appellate court, first district, provide that all three judges must "participate in the decision of every case" (134 Ill. 2d R.

22(c); 47 Ill. App. 3d Rules 1(3), (4)), only two judges are necessary to constitute a quorum (Ill. Const. 1970, art. VI, §5; Ill. Rev. Stat. 1987, ch. 37, par. 25), and the concurrence of only two judges is necessary for a decision (Ill. Const. 1970, art. VI, §5; Ill. Rev. Stat. 1987, ch. 37, par. 25; 134 Ill. 2d R. 22(c); 47 Ill. App. 3d Rules 1(3), (4)). Thus, the requirement that all three judges participate in a decision of the appellate court is not to be equated with that which is required, in terms of judicial authority, to render a valid judgment. The authority to do so exists when any two of those judges, constituting a quorum, concur.

In *Kinne v. Duncan* (1943), 383 Ill. 110, this court rejected an argument similar to that raised by defendants in a case involving partnership rights in an oil lease. On May 26, 1942, a three-judge panel of the appellate court convened to consider the issues raised in the matter on appeal. Justice Dady was then a member of that panel. Subsequently, Justice Dady's term of office expired, and he was assigned to another division of the appellate court. On June 9, 1942, Justice Bristow was appointed in Justice Dady's stead. The panel, as so comprised, first met on June 22, 1942. Nevertheless, on June 27, 1942, an opinion, bearing Justice Dady's name as author, was issued in the matter.

Based on the quorum and concurrence requirements observed above, this court held that it was immaterial that the opinion of the court bore Justice Dady's name even though he was no longer a member of the division of the court which issued the opinion. (*Kinne v. Duncan*, 383 Ill. at 113-14.) Noting the decision was unanimous, the court nevertheless held it sufficient for the validity of the decision that a quorum of the court had existed. *Kinne v. Duncan*, 383 Ill. at 114.

That same understanding of the judicial authority of the appellate court is reflected in *People ex rel. Byrnes*

18

*v. Standard* (1956), 9 Ill. 2d 372, and *Nelson v. Union Wire Rope Corp.* (1963), 39 Ill. App. 2d 73, as well as in decisions rendered in foreign jurisdictions involving similar issues (see *Bowles v. D. Mitchell Investments, Inc.* (Fla. App. 1978), 365 So. 2d 1028; *Dickenson State Bank v. Ogden* (Tex. Ct. App. 1981), 624 S.W.2d 214). Therefore, even considering that Justice Coccia had vacated office at the time the decision was actually filed, a quorum of the appellate court existed at that time such that the concurrence of the two justices constituting the quorum was sufficient to render a valid decision.

The common dictionary definition of the term "participation" reinforces the understanding that use of that term in Rule 22(c) and Rules 1(3) and (4) of the appellate court's administrative rules cannot be construed to impose a greater requirement beyond the quorum and concurrence requirements necessary for the exercise of the appellate court's judicial authority. Participation simply means the interaction of a group in an activity. (Webster's Third New International Dictionary 1646 (1986).) Here, that activity is the deliberation toward the ultimate decision in a case before the appellate court. The actual rendering of a decision or judgment, however, is governed according to the quorum and concurrence requirements, not by what is required in terms of the means of arriving at that end.

Here, the order, itself, recites that Justice Coccia "fully participated" in the decision "prior to his resignation from the court." That plain statement confirms that deliberation on the matter properly was completed prior to the time Justice Coccia actually vacated his office. We find nothing in the language of either Rule 22(c) or Rules 1(3) or (4) to require more of the appellate court.

Because the appellate court's judicial authority exists when two judges, a quorum, concur, and because the required participation of all three judges is not equated

with that authority, it is of no consequence to the decision's validity that the appellate court clerk enters judgment after the third judge vacates office so long as he properly participated in the decision. In that sense, cases such as this are governed by the same considerations present in the cases cited by defendants and the principles as we noted underlying those cases. Here, because the order recites that Justice Coccia participated in the decision as required, the order is valid based on the concurrence of the two remaining judges even though the order was entered by the appellate court clerk after Justice Coccia vacated office.

Defendants otherwise substantively challenge the order contending that the appellate court applied an improper consideration regarding collateral estoppel in holding Cirrincione should not have been precluded by the trial judge from denying that she was aware of the landmark status of the Rincker House. As we have noted, the appellate court relied on the determination in *City of Chicago v. Roppolo* that, although Cirrincione knew of the landmark status of the Rincker House, she was unaware of Roppolo's obligation to move, reconstruct, and restore the structure. The court concluded that Cirrincione's knowledge regarding the landmark status was "plainly incidental" to whether Roppolo failed to reveal to Cirrincione his obligations with respect to the Rincker House. Defendants now argue that in using the term "plainly incidental," the appellate court improperly departed from established standards for determining the application of collateral estoppel (see *Ballweg v. City of Springfield* (1986), 114 Ill. 2d 107).

The doctrine of collateral estoppel, variously referred to as collateral estoppel by judgment, issue preclusion (see *City of Burbank v. Glazer* (1979), 76 Ill. App. 3d 294), estoppel by verdict, or issue estoppel (see Waldeck, *Judgments—Applicability of Doctrine of Collateral*

*Estoppel in Illinois in Subsequent Suit Between Co-Parties in Prior Action,* 51 Ill. B.J. 249 (1962)), bars the relitigation of particular issues decided in another action between the same parties on a different cause of action. (*Housing Authority v. YMCA* (1984), 101 Ill. 2d 246.) Although collateral estoppel is often recognized as a branch of *res judicata,* courts just as regularly make no distinction between the doctrines. (Annot., 24 A.L.R.3d 318, 323 (1969).) And, although it has been noted that both doctrines are subject to traditional analyses, there may be no area of law less susceptible to rigid formulation. (24 A.L.R.3d at 323 (1969).) What is clear is that *res judicata* precludes relitigation of a single cause of action between two parties, extending to both causes actually litigated and those which might have been, while collateral estoppel is limited to particular facts and issues in common between the prior and subsequent actions which are material to the dispositions of both. 24 A.L.R.3d at 322-23 (1969); 51 Ill. B.J. 249 (1962).

The appellate court here was, therefore, correct to recognize that materiality is an important consideration in the application of collateral estoppel. Materiality is an aspect of the determination as to whether an issue resolved in a prior adjudication is identical with an issue put forth in a present case. (See Restatement (Second) of Judgments §27, at 250 (1982).) Identity of issues is the first of the pertinent questions to be answered in determining the application of the doctrine. (See *Ballweg v. City of Springfield,* 114 Ill. 2d 107.) However, although materiality is a concern here, the answer to the particular question presented regarding collateral estoppel turns on other considerations.

Generally, although the alignment of parties on the same side in the initial litigation is immaterial (see *Lynch v. Chicago Transit Authority* (1965), 62 Ill. App. 2d 220), the doctrine of collateral estoppel finds no appli-

cation to bar the litigation of facts or issues in a subsequent suit where the co-parties, or specifically here, codefendants, were not true adversaries in the prior action. (*Remus v. Schwass* (1950), 406 Ill. 63; *S & S Automotive v. Checker Taxi Co.* (1988), 166 Ill. App. 3d 6; 51 Ill. B.J. 249 (1962); 46 Am. Jur. 2d *Judgments* §546 (1969); 24 A.L.R.3d 318 (1969).) That is so because, where codefendants do not occupy adverse positions to each other in the initial action, the only rights adjudicated are those of the plaintiff as against each defendant, not the rights of the defendants as between each other. (51 Ill. B.J. 249 (1962).) Whether positions are considered adverse may be answered by whether the parties' rights were formally put in issue in the initial action through an adversary pleading, as in a counterclaim. (51 Ill. B.J. 249 (1962); see Ill. Rev. Stat. 1987, ch. 110, par. 2—608.) Some courts have recognized that only then are the co-parties presumed able to control the proceedings so as to establish any rights as against each other. 51 Ill. B.J. 249 (1962).

However, other courts, including those in this State, have recognized that the absence of formal pleadings does not necessarily preclude the existence of adversity between co-parties in the initial action to defeat the application of collateral estoppel. (See *Rose v. Dolejs* (1955), 7 Ill. App. 2d 267; *Lynch v. Chicago Transit Authority*, 62 Ill. App. 2d 220.) Where no formal pleadings have established the adversity of the co-parties, the court in the subsequent action must address whether the factual issue to be decided between the co-parties as to each other is the same as that which determined their rights as against their common opponent. (51 Ill. B.J. 249 (1962).) Nevertheless, the relevant concern in the absence of formal pleadings is no different than as where such pleadings exist. The critical inquiry is whether the co-party against whom estoppel is sought in the subse-

quent action enjoyed the capacity to control the determination of the subject issue in the initial suit so that it would be fair to preclude relitigation of the issue in the subsequent action. (*City of Burbank v. Glazer* (1979), 76 Ill. App. 3d 294, 299-300, quoting *Chas. Ind Co. v. Cecil B. Wood, Inc.* (1965), 56 Ill. App. 2d 30, 36-38; 51 Ill. B.J. 249 (1962).) The aspect of control is reflected in section 28 of the Restatement (Second) of Judgments, which recognizes an exception to the application of collateral estoppel where the party against whom preclusion is sought was unable, as a matter of law, to appeal the judgment in the initial action. (Restatement (Second) of Judgments §28 (1982); 51 Ill. B.J. 249 (1962).) Thus, as we alluded to above, materiality becomes a concern in the determination of whether the issue to be decided between the co-parties as to each other, in the absence of adversary pleadings, is the same, in fact, as that which determined their rights as against their common opponent. (*Chas. Ind Co. v. Cecil B. Wood, Inc.*, 56 Ill. App. 2d at 37-38.) And it is in that determination that the capacity of the party against whom estoppel is sought to control the issue in the initial litigation is of aid in the analysis.

Because the parties here were codefendants in *City of Chicago v. Roppolo* and we have no means of examining the pleadings filed in that action, the application of the doctrine is made even more difficult than what is presented by its nature. Having no mandatory pleading requirement imposed on them under the law in Illinois, plaintiffs here did not file a counterclaim against defendants in the initial action which would provide a basis to litigate their respective rights as between each other as adversaries. We therefore must consider whether, specifically, the issue of Cirrincione's knowledge is, nevertheless, the same issue litigated by plaintiffs in that initial action, and now here, such that, in the absence of a

counterclaim, we could conclude that the issue was, in fact, then determined. Understanding the theories underlying each suit aids in that analysis.

In *City of Chicago v. Roppolo*, the city sought to establish a constructive trust over the savings occasioned to Roppolo by the demolition which rendered impossible his promise to move, reconstruct, and restore the Rincker House. The record here indicates that the city also sought compensatory and punitive damages against all of the named defendants, including plaintiffs in this case, in separate counts. It was in the defense of the city's allegations of fraud against plaintiffs here that Cirrincione's awareness of the landmark status of the structure became material.

If the sole basis for liability in the present case was defendants' failure to inform of the landmark status of the Rincker House, an argument could be made that, based upon collateral estoppel principles, it might be proper to bar Cirrincione from denying she, herself, had gained knowledge of the status. Although that issue would have been decided in the initial action as between the city and plaintiffs here, the issue would seemingly be identical to that as between plaintiffs and defendants in this action. However, initially, we note that Cirrincione could not have appealed from the determination in the initial action that her knowledge did not form a basis for liability because she was unaware of Roppolo's commitment to the city. The inability to legally seek review of that conclusion indicates that collateral estoppel should not be applied in accordance with the exceptions to the application of the doctrine provided for in the Restatement (Second) of Judgments.

More importantly, Cirrincione's knowledge is not the sole basis to support plaintiffs' action against defendants. It is true that plaintiffs' complaint reasonably can be read to allege only that, as basis for the theory of

fraud, defendants misled plaintiffs as to the landmark status of the Rincker House and that work undertaken with respect to the application for demolition would conform to the city's municipal code. However, evidence presented at trial by way of the stipulation clearly introduced, as an issue, the fact that Roppolo had promised to move, reconstruct, and restore the Rincker House at the direction of the Landmark Commission. That issue, as the appellate court recognized in the initial action, makes the issue, as between plaintiffs and defendants, somewhat different than that determined as between plaintiffs here and the city. For that reason, the appellate court was correct to conclude it was improper to preclude Cirrincione from denying that she knew of the landmark status of the Rincker House.

The understanding that evidence of Roppolo's agreement to move, reconstruct, and restore the Rincker House distinguishes the present action from the city's initial action has importance beyond the considerations of collateral estoppel. At trial, plaintiffs, too, recognized, albeit late, that evidence of that agreement supported a different type of misrepresentation by defendants and, therefore, provided a different basis upon which to ground their action against defendants than as alleged in the complaint. Accordingly, plaintiffs moved to amend the complaint to conform its allegations to the proof. As we stated above, the trial judge denied that motion. The appellate court determined the denial of that motion was not an abuse of discretion (see *Ryan v. Mobile Oil Corp.* (1987), 157 Ill. App. 3d 1069).

In view that evidence of Roppolo's promise was undisputed, we believe the trial judge should have permitted that amendment. The existence of Roppolo's agreement to move, reconstruct, and restore the Rincker House is directly related to the issue of whether defendants withheld information about the structure which was

a material aspect of plaintiffs' agreement to complete the demolition. An amendment in accordance with that evidence is proper under the general understanding that reviewing courts should not ignore plaintiff's real claim so long as it is supported by evidence, even though it may not have been adequately pleaded. *Pickett v. First American Savings & Loan Association* (1980), 90 Ill. App. 3d 245.

We therefore affirm that portion of the appellate court's order reversing the circuit court as to its ruling on the motion *in limine* precluding Cirrincione from testifying as to her awareness of the landmark status of the Rincker House and reversing the directed verdict in defendants' favor and remanding the matter for a new trial. However, we reverse that portion of the appellate court's order which affirmed the trial judge's denial as to plaintiffs' request to amend their complaint to include evidence of Roppolo's promise to move, reconstruct and restore the Rincker House. The judgment of the circuit court is reversed, and the cause is remanded to that court for further proceedings.

*Appellate court affirmed
in part and reversed in part;
circuit court reversed;
cause remanded.*

JUSTICE BILANDIC took no part in the consideration or decision of this case.