(Nos. 73731, 73732 cons. )

CENTRAL ILLINOIS PUBLIC SERVICE COMPANY, Appellee, v. ALLIANZ UNDERWRITERS INSURANCE COMPANY *et al.* (International Surplus Lines Insurance Company *et al.*, Appellants).

*Opinion filed February 17, 1994.*

McMORROW, J., dissenting.

John G. Campbell, Richard J. Geddes and Michael C. Cook, of McCullough, Campbell & Lane, of Chicago, for appellant International Surplus Lines Insurance Co.

Skadden, Arps, Slate, Meagher & Flom, of Chicago (Timothy G. Reynolds, Scott M. Seaman and Susan L.

Oliff, of counsel), for appellant General Reinsurance Corp.

Margaret J. Orbon and Mark J. Seplak, of Clausen, Miller, Gorman, Caffrey & Witous, P.C., of Chicago, and Paul R. Koepff and Joseph E. Boury, of Mudge, Rose, Guthrie, Alexander & Ferdon, of New York, New York, for appellant California Union Insurance Co.

Eugene R. Anderson and Lester O. Brown, of Anderson, Kill, Olick & Oshinsky, of Palo Alto, California, Stephen R. Kaufmann and Thomas H. Wilson, of Sorling, Northrup, Hanna, Cullen & Cochran, of Springfield, and Kevin M. Forde and Mary Anne Mason, of Kevin M. Forde, Ltd., of Chicago, for appellee.

JUSTICE HEIPLE delivered the opinion of the court:

Defendants are insurance companies who filed this interlocutory appeal following the trial court's determination that a series of facts found by a jury in an earlier phase of this complex litigation could not be relitigated. For the reasons that follow, we reverse.

BACKGROUND FACTS

Central Illinois Public Service Company (CIPS) is a public utility corporation which provides electric and gas services to a large number of consumers in central Illinois.

CIPS had several plants where it manufactured gas from coal, including one in Taylorville, Illinois, and one in Du Quoin, Illinois. It owned and operated these plants for several decades before it sold the Taylorville site in 1961 and parts of the Du Quoin site in 1978 and again in 1985.

To shield itself from liability, CIPS contracted with the 47 insurance companies named in this action for

liability insurance. Three of these companies issued "Environmental Impairment Liability" (EIL) insurance policies, and the vast majority (and all of the appellants on appeal) issued "Comprehensive General Liability" (CGL) insurance policies. In the CGL policies issued after 1964, each of the carriers promised to indemnify CIPS for all claims against CIPS resulting from occurrences which CIPS neither expected nor intended. Before 1964 the policies used the term "accident" instead of "occurrence" and did not articulate an "unexpected and unintended" requirement, although this would certainly be anticipated from the term "accident." In addition, most CGL policies included a pollution exception, which specifically exempted coverage for damage caused by pollution, except to the extent that the pollution was sudden and accidental.

The EIL insurers agreed to indemnify CIPS for claims made against it for environmental impairment. Again, this basically provided coverage for unintended and unexpected damage to the environment.

In November 1985, the Illinois Environmental Protection Agency (Agency) notified CIPS that it was a "potentially responsible party" for violations of the Illinois Environmental Protection Act (the Act) (Ill. Rev. Stat. 1985, ch. 111 1/2, par. 1001 *et seq.*) at the Taylorville site. This resulted in part from the rupturing of an underground tank by contractors of the owner of the Taylorville property in 1985. It also resulted in part from the buildup of by-products from coal-to-gas manufacturing.

In 1987, the Agency notified CIPS that it was a potentially responsible party for environmental violations at the Du Quoin site. Again, these violations occurred from the buildup of by-products from coal-to-gas manufacturing. CIPS notified its insurers of these events.

On August 21, 1987, CIPS filed a complaint in the circuit court of Morgan County. It named the 47 insurance companies as defendants and sought a declaration of coverage. A defense raised by all CGL insurers was that the damage was expected or intended, and therefore there was no coverage.

In June of 1989, CIPS added two more sites and pled separate causes of action against each defendant. Eventually, CIPS expanded the complaint to its present form. As presently constituted, the action involves 15 former gas manufacturing sites.

On June 28, 1989, CIPS filed a motion for partial summary judgment directed at the EIL policies issued by American Empire Surplus Lines (American Empire), Evanston, and First State Insurance Companies concerning the Taylorville site.

On July 10, 1989, the circuit court entered its first case management order, requiring defendants to conduct discovery jointly by submitting joint document requests, joint interrogatories, and jointly designating a lead questioner for each deposition. Parties were to "avoid or minimize" duplicative motions, briefs and discovery to the extent consistent with the parties' individual interests; in other words, join in or adopt pleadings with which they agreed.

On March 22, 1990, Judge J. David Bone recused himself from the case due to its size and the limited resources of the Morgan County court. On June 26, 1990, this court entered an order transferring the cause to Cook County, where the case was assigned to Judge Warren D. Wolfson.

On October 19, 1990, the trial court entered an order establishing a discovery committee, which was to coordinate all defense discovery efforts and to lead each deposition. On that day it also entered an order allowing insurers whose liability would attach after $25 million

the option of being placed on inactive status. If an insurer exercised this option, it could not participate in further discovery but no order, decision or finding entered after October 19, 1990, would be binding on that insurer.

Also on that day, CIPS expressed a desire to go forward at one time against all insurers with respect to the Taylorville site. The trial court complied with this request and entered a case management order one week later which limited discovery to matters relevant to the Taylorville site so that priority could be given to the claims as to that site.

A number of summary judgment motions relating to the CGL policies were filed and briefed through the spring and into the summer of 1991. On June 12, 1991, the circuit court ruled on cross-motions for summary judgment regarding the EIL policies as to the Taylorville site. It found that several issues of material fact would require determination at trial. Several days later, the court scheduled a trial to begin on September 30, 1991, which was to be confined to the EIL issues. The trial judge reserved ruling on whether any findings at the EIL trial would be binding on the non-EIL defendants, and also stated that he would not allow the non-EIL defendants to take part in the trial.

On July 12, 1991, several CGL defendants moved for leave to participate in the EIL trial. In the alternative, they moved for complete severance of the actions against the CGL insurers from the actions pending against the EIL insurers. In that motion, the CGL defendants recognized that "the coverage issues pertaining to the EIL carriers and the coverage issues pertaining to the non-EIL carriers are in some ways similar and will probably involve some of the same evidence," but argued that the differing interests of the parties required that the CGL insurers should not be bound by

findings adjudicated only by the EIL insurers. The trial court denied the motion.

Shortly before the trial, the Evanston and First State insurance policies were dismissed from the Taylorville action. Those policies indemnified CIPS for damages in excess of the American Empire coverage, and it became clear that the American Empire coverage would not be exhausted. The trial between CIPS and American Empire lasted 12 days. At its conclusion, special interrogatories were tendered to the jury.

In Special Interrogatory A, the jury was asked:

"Was a liquid containing irritants, contaminants, or pollutants emitted, discharged, disposed of, dispersed or released directly from the separator to the surface area of Area A of the Taylorville site in 1912 or thereafter?"

The jury's answer was "NO," thus ending its inquiry into contamination of "Area A" of the Taylorville site. The second set of questions concerned the "gas plant site area" of the Taylorville site. The questions and the jury's answers were:

"1. Did CIPS know the water gas tar was an irritant, contaminant, or pollutant at the time it was emitted, discharged, disposed of, dispersed, released, seeped or escaped from the separators or holder at the gas plant site area of the Taylorville site in 1912 or thereafter?
[Answer:] YES.

2. Did CIPS expect the emission, discharge, disposal, release, seepage, or escape of irritants, contaminants, or pollutants from the separators or holder at the gas plant site area of the Taylorville site in 1912 or thereafter?
[Answer:] NO.

3. Did CIPS intend the emission, discharge, disposal, release, seepage, or escape of irritants, contaminants, or pollutants from the separators or holder at the gas plant site area of the Taylorville site in 1912 or thereafter?
[Answer:] NO."

On November 1, 1991, the trial court directed briefing on the issue of whether the CGL defendants could relitigate the jury's finding in the EIL trial that

CIPS had no expectation of or intention to cause the damage. The appellants in this cause unfairly characterize this decision as a *sua sponte* order. In fact, it was issued in response to a comment made by CIPS's attorney, who stated that "[w]hen we pursued discovery against the defendants, we were foreclosed from a lot of discovery because this was one offense. And now they had a joint defense and they all participated in that defense and so we think that all defendants are precluded from questioning the jury's verdict. They're bound by it having participated in it."

On January 16, 1992, after considering the briefs and oral arguments, the trial court entered an order finding that the jury's verdict was binding on those CGL defendants which had not elected to take inactive status pursuant to the October 19, 1990, order. The court's ruling was based, in part, on the defendants' inability to articulate what issues or evidence not considered in the EIL trial they wished to present to a second jury. The court found that "[t]here were general representations of more and better but no new evidence, no unconsidered legal principles, no real assurance that another trial would be anything but a replay." Recognizing that there was room for disagreement and the importance of this issue to the ultimate outcome of this complex lawsuit, the trial court certified its order for interlocutory appeal. The appellate court denied leave to appeal, but this court granted the defendants' petition for leave to appeal (315 Ill. 2d R. 315).[1]

## ANALYSIS

Ultimately we are called upon to decide whether the trial court erred in its issue preclusion ruling. Appel-

---

[1]Subsequent to our taking this case under advisement, all appellants, with the exception of Columbia Casualty Company, were dismissed from this appeal due to settlements with the plaintiff.

lants have framed the issue on appeal as whether the doctrine of collateral estoppel was properly applied. One appellant, in trying to equate issue preclusion with collateral estoppel, cites this court's recent case *Cirro Wrecking Co. v. Roppolo* (1992), 153 Ill. 2d 6, 19, where the court recognized that collateral estoppel has been referred to as issue preclusion. Appellants thus fill their briefs with the requirements of collateral estoppel and argue that they were not met.

However, these discussions are misplaced. "The doctrine of collateral estoppel applies when a party or someone in privity with a party participates in two separate and consecutive causes arising on *different* causes of action and some controlling fact or question material to the determination of both causes has been adjudicated against that party in the former suit by a court of competent jurisdiction." (Emphasis in original.) *Housing Authority v. Young Men's Christian Association* (1984), 101 Ill. 2d 246, 252.

Thus, the most rudimentary threshold requirement for the application of collateral estoppel is the existence of two separate proceedings. Collateral estoppel is wholly irrelevant in the context of relitigating facts found in the earlier part of the same proceeding.

The appellants ask this court to allow them to relitigate the issues resolved in the very proceeding in which they were parties. While this request seems to fly in the face of that fundamental rule that an issue once resolved is binding on the parties, this case has a special circumstance. The special circumstance is that the trial court barred the appellants from participation in the trial process. Thus, we are compelled to reverse the trial court on general due process grounds under both the Illinois and Federal Constitutions. The due process clause requires, at a minimum, that a party have a full and fair opportunity to litigate an issue before he is

bound by that issue's resolution. No such opportunity was provided to appellants in this case. To the contrary, appellants were barred from participation.

The appellants' due process rights would have been satisfied by granting either of the alternatives which they requested. That is, participation or severance. We express no opinion as to which alternative is to be favored, leaving that to the sound discretion of the trial court. That may be considered anew by the trial court upon remand, which we now direct.

Since defendant American Empire was accorded a complete trial on the issue of its coverage, it was properly bound by the jury's verdict. The judgment as to the remaining defendants is vacated, and this cause is remanded to the circuit court of Cook County.

> *Circuit court affirmed in part*
> *and vacated in part;*
> *cause remanded.*

JUSTICE McMORROW, dissenting:

I agree with the majority's view that collateral estoppel is not the proper focus for this court's review of the trial court's challenged ruling that the defendant-appellants should be precluded from relitigating the specific and limited coverage issues decided by the jury. I disagree with the majority's determination that the trial court's decision deprived the defendant-appellants of procedural due process.

In complex, multiparty litigation, the trial court must exercise considerable discretion to manage the proceedings so that issues are decided both fairly and expeditiously. To accomplish these objectives during the course of the trial itself, it has been suggested that the court appoint lead counsel or trial counsel to serve as representative for other parties also involved in the proceeding. (See, *e.g.*, Manual for Complex Litigation, Second §§ 20.221, 20.222 (1985) (hereinafter Manual for

Complex Litigation); Illinois Manual for Complex Litigation 22, 124-25 (1991).) In the case at bar, the plaintiff filed suit against 47 insurance carriers, all of whom presented the common defense that they were not obligated to provide coverage under their respective insurance policies because the plaintiff intended or expected the alleged environmental damage that had occurred. I acknowledge that perhaps it would have been more prudent if, prior to trial, the court had formally appointed lead counsel or trial counsel to act as a representative for the other defendants with respect to the limited issues carved out for resolution in the jury trial.

However, the court's failure to do so is an inadequate ground to reverse the jury's findings and remand the matter for further proceedings. The trial court found that the defendant who formally appeared at and participated in trial, American Empire, acted as the "virtual surrogate" for the defendant-appellants. I find no manifest error in the trial court's factual finding in this respect. The defendant-appellants fully participated in all phases of discovery and shared litigation expenses. In addition, the defendant-appellants have been unable to point to any new, different, or additional evidence or argument that they would present upon retrial of the issues decided by the jury.

In light of these circumstances, the trial court's decision in the instant cause did not deprive the defendant-appellants of procedural due process. In my view, the trial court's ruling was a proper and reasoned exercise of the court's inherent power to manage and administer the progress of this complex, multiparty litigation, in which the plaintiff sought declarations of insurance coverage with respect to policies issued by 47 insurance carriers named as defendants in the plaintiff's suit.

## BACKGROUND

On August 21, 1987, CIPS filed its first complaint in

Morgan County against 47 insurance carriers. The suit sought a declaratory judgment of the rights and responsibilities of the parties under various insurance policies issued to CIPS by the defendants. Certain of the defendants had issued Comprehensive General Liability (CGL) insurance to CIPS, while others had issued Environmental Impairment Liability (EIL) insurance. CIPS sought coverage under the policies for actions filed against CIPS that arose as a result of alleged environmental damage at and around gas-from-coal manufacturing plant sites owned and operated by CIPS.

The record reveals that the trial court undertook painstaking and meticulous efforts to control the progress of the cause and to ensure that the due process rights of the parties were protected by allowing them to participate in all phases of the litigation. In July 1989, the court entered its first case management order. This order set out rules regarding production of insurance policies and confirmations, a general schedule for discovery, filing and service of papers and motions, and filing of objections, protective orders, and motions to compel. The court also ordered the defendants to choose three law firms to act as liaison counsel. The court directed that liaison counsel would have the responsibility to (1) maintain a master service list of all counsel of record, (2) coordinate efforts to draft a consolidated set of document requests from the defendants to CIPS, (3) coordinate and schedule depositions, and (4) coordinate with CIPS's counsel in the preparation and filing of a joint written report of the status of discovery.

In March 1990, the court entered its second case management order. The court directed that CIPS and liaison counsel meet to schedule depositions and to establish a master library of the defendants' pertinent insurance policies. The court also entered a discovery order, advising that priority would be given to discovery relat-

ing to issue of coverage under the EIL insurance policies relating to the Taylorville site, but that other discovery should not be delayed. Later in March 1990, however, the trial judge entered an order withdrawing from the further administration of the case because of its extraordinary time demands, the court's full schedule, and the limited facilities, budget and personnel in Morgan County.

In June 1990, this court transferred the cause to the circuit court of Cook County, where it was assigned to Judge Warren D. Wolfson. At a status hearing between court and counsel in October 1990, the trial court directed the defendants to establish a discovery committee to coordinate the scheduling of depositions and to serve as lead counsel in posing questions during depositions so that relevant information could be obtained without repetition or duplication.

Also in October 1990, the trial court entered a third case management order to supplement and revise the courts' previous case management orders. In this third order, Judge Wolfson instructed that priority for all purposes would be given to the claims relating to the Taylorville site and that, until further order, discovery would be limited to matters relevant to the Taylorville site. The judge set a date for closing of discovery and suggested the parties engage in multiple-track discovery in order to meet that deadline. The judge directed that the taking of discovery depositions should be expeditious, that colloquy of counsel should be minimal, and that the parties should avoid taking depositions on matters that were covered with finality in pleadings or written discovery. The court directed that CIPS and the defendants' discovery committee negotiate in good faith concerning the order of discovery and the scope of issues to be covered, and that the parties should submit to the court a list of all depositions to be taken. The court's or-

der also set a date for disclosure of expert witnesses and answers to expert witness interrogatories, as well as dates for filing motions for summary judgment and other substantive motions. Trial on the EIL coverage at the Taylorville site was set for September 1991.

At a status hearing between court and counsel on June 17, 1991, the court considered argument from one defendant regarding the effect of an EIL judgment on the non-EIL defendants:

"MR. KRAFSUR: Your Honor, I'd like to raise the issue I think Mr. Katauskas raised when we were before you last and that is something additional about the scope of this EIL trial.

I think some of the non-EIL carriers are concerned that if it proceeds only with the EIL carriers, that certain matters will have been determined in the case that may affect the non-EIL carriers at a later time.

So I was wondering first if the Court had given any consideration to Mr. Katauskas' remarks so that we can address that more fully with you.

THE COURT: Yes, I have thought about it and my inclination is simply to say that I'll make no decision at this time as to whether any findings I make at this trial are binding or not on other defendants.

I'll simply reserve that as a matter of law for us to discuss issues of issue preclusion and whatever depending on how I rule.

If I rule adversely to the defendants and it can be demonstrated that there are other facts I did not hear or other arguments I did not consider, then I'd be inclined to reopen for the defendants, but there would have to be some kind of showing.

As to whether the issues of preclusion would apply in this case I haven't made that determination. I'm not going to concern myself with it until when and if the issue arises.

Any guidance you want to give me on it I'll be happy to take but I'm not going to let it slow up the trial that I've now set for September 30th nor will I allow other parties to take part in the trial. ***

MR. KATAUSKAS: Just so I understand you, your Honor, you're saying you don't know at this time whether any of those findings you make will be the law of the case as to other defendants as well?

THE COURT: That's right, that's correct."

In July 1991, certain non-EIL defendants filed a motion for leave to participate in the trial between CIPS and American Empire regarding certain coverage issues. At a hearing in August 1991, the court rejected the motion. Trial on the specific and limited issues of coverage under the EIL insurance policy issued by American Empire was conducted in September 1991. In response to special interrogatories, the jury indicated that it found CIPS knew the material at issue at the Taylorville site was an "irritant, contaminant or pollutant at the time it was *** discharged." The jury further indicated that it found that CIPS did not "expect" or "intend" the discharge of the material.

Following trial, the court invited briefing and argument on the question of whether the jury's responses to the special interrogatories would be binding upon the non-EIL defendants who had not formally participated in the trial. In the trial court's written order of January 16, 1992, the court found that American Empire acted as the "virtual representative" of the other defendants. For this reason, the court determined that traditional elements of collateral estoppel precluded the defendants from relitigating the issues decided in the jury's answers to special interrogatories. With respect to the evidence presented to the jury on the coverage issues, the trial court specifically observed:

"American Empire relied on industry literature and expert witnesses. The writings necessarily were dated, since the case concerned intent and expectations more than 50 years old. The people with direct knowledge of CIPS' disposal practices at Taylorville are gone. Joining Defendants can do nothing to revive them.

The motions filed in this case indicate that all defen-

dants jointly obtained or at least shared industry literature.

The defense experts were jointly retained by the defendants. *** It is clear from the depositions and the trial testimony that the experts did not think of themselves as employed by any particular insurance company.

It is true that I ordered discovery to be jointly conducted by the defendants. I also have made it clear that joint discovery is never to prejudice the rights of any defendant. No defense expert was renounced or disclaimed by any defendant. The Rule 220 Interrogatory responses show a defense unanimity of position.

A trial is shaped by the facts that go into it. I find that American Empire was, in effect, surrogate for Joining Defendants, advancing legal theories and proofs on behalf of all defendants on the issues of intent and expectation. That is substantial participation in the presentation of the case. That is a full and fair opportunity to litigate fact issues in this case. See Restatement (Second) of Judgments, Sec. 39.

In short, I find the Joining Defendants are 'the same, in effect,' as American Empire was in the jury trial. *** I believe it would be contrary to equity and good conscience to conduct a mirror image trial on the issues of fact decided by a jury. I find there is no good reason, consistent with our notions of basic fairness and due process, to allow the Joining Defendants to relitigate the questions answered by a jury."

The majority reverses the trial court's disposition, relying on "general due process grounds under both the Illinois and Federal Constitutions" and the notion that the "due process clause requires, at a minimum, that a party have a full and fair opportunity to litigate an issue before he is bound by that issue's resolution." (158 Ill. 2d at 225-26.) According to the majority, these due process principles were violated in the present case, because "[n]o such opportunity [to have a full and fair opportunity to litigate an issue] was provided to appellants in this case" and because the majority finds "appellants were barred from participation." (158 Ill. 2d at 226.)

The majority believes that the court should have granted either of the alternatives requested by the non-EIL defendant-appellants, *i.e.*, participation in or severance from the trial. The majority expresses "no opinion as to which alternative is to be favored, leaving that to the sound discretion of the trial court \*\*\* [to] be considered \*\*\* upon remand." 158 Ill. 2d at 226.

## ANALYSIS

The majority fails to address the particular problems a trial judge confronts when faced with the daunting task of managing a voluminous case involving complex issues and numerous parties. The majority also fails to recognize the increasingly significant and activist role that a trial judge must play in complex, multiparty litigation. (See, *e.g.*, McGovern, *Toward a Functional Approach for Managing Complex Litigation*, 53 U. Chi. L. Rev. 440, 442-43 (1986) (hereinafter *Managing Complex Litigation*).) In order to fully administer a complex lawsuit with multiple parties, the trial judge must have the inherent authority to manage the case from discovery through to litigation in a fashion that is both orderly and fair. (See Manual for Complex Litigation § 20.1.) The comments made in the Manual for Complex Litigation echo these concerns:

"Complex litigation often involves numerous parties, many of whom have common or similar interests but separate counsel. Traditional procedures—which assume that all papers and documents are served on all attorneys and that each attorney will file motions, present arguments, and conduct examinations—may result in enormous waste of time, money, and energy, as well as in confusion and indirection.

In some cases the attorneys on their own coordinate their activities to eliminate any significant problems among themselves or to their clients, other counsel, and the court. More often, however, the court should itself institute special procedures under which the practices

normally incident to individual representation are reshaped in the interests of economy and efficiency. Although details vary, the basic approach is to select and empower, by court order if necessary, one or more attorney to act on behalf of other counsel and parties in handling particular aspects of the litigation." Manual for Complex Litigation § 20.22.

The Manual for Complex Litigation suggests that various roles can be given to attorneys to streamline the course of the litigation. For example, the Manual states that "Liaison Counsel" is "generally used to describe attorneys whose primary duties for the group involve essentially administrative matters." (Manual for Complex Litigation § 20.221.) With respect to lead counsel and trial counsel, the Manual explains that lead counsel "ordinarily have major responsibility for formulating and presenting positions on substantive and procedural issues during the litigation," whereas trial counsel "may be selected to serve as principal attorney for the group at trial in presenting arguments, making objections, conducting examination of witnesses, and generally organizing and coordinating the work of the other attorneys on the trial team." (Manual for Complex Litigation § 20.221.) The Manual for Complex Litigation also makes these observations:

"In multi-party cases substantial waste of time, as well as confusion, may result unless a limited number of counsel are given primary responsibility at trial for the examination of witnesses and the presentation of objections and arguments. The court should insist that appropriate arrangements be made, whether formally by designating one or more attorneys to serve as lead counsel or members of a trial team ***, or informally by the attorneys deciding who will be chiefly responsible for the examination of particular witnesses. Other counsel should be afforded an opportunity to conduct supplemental examination, particularly on any matters unique to their clients not already covered in prior examination; but redundant examination merely for emphasis should not

be permitted to any greater degree than would be appropriate were only a single party involved." Manual for Complex Litigation § 22.22.

Thus, the trial court's power to control the course of the litigation must include the authority to "arrange parties into coordinated groups and to *** [appoint] Liaison Counsel for administrative services and expenditures on behalf of the group's members" (*State of New Jersey Department of Environmental Protection v. Gloucester Environmental Management Services, Inc.* (D.N.J. 1991), 138 F.R.D. 421, 428) as well as the appointment of lead or trial counsel during litigation (*In re Ivan F. Boesky Securities Litigation* (2d Cir. 1991), 948 F.2d 1358, 1365-66). Similarly, the trial court's decision to limit the introduction of evidence during the course of trial, or the scope of questioning, is usually a matter within the trial court's sound discretion. See, e.g., Manual for Complex Litigation § 22.1 *et seq.*; Illinois Manual for Complex Litigation, at 22, 79-99, 124-25.

In light of this commentary, I acknowledge that perhaps it might have been more prudent if the trial court in the instant cause had formally appointed American Empire as lead counsel or trial counsel for the hearing on the specific and limited coverage issues decided by the jury in the present cause. However, although American Empire was not formally appointed as lead counsel for the other defendants, the record indicates that American Empire did in fact act as lead counsel, presenting the experts agreed upon by all the defendants, on the issues common to all the defendants, regarding whether CIPS intended or expected the environmental damage that had occurred. I emphasize that the factual issues that were presented to the jury at the trial between CIPS and American Empire are the same issues that form the non-EIL defendants' theories of their case: if CIPS did not intend or expect the emissions release, then logically CIPS could not have

expected or intended the resulting property damage. This issue was common to both American Empire and the non-EIL defendants and imposed upon both American Empire and the non-EIL defendants the same burden of proof, *viz.*, to establish that CIPS expected or intended the emissions that caused environmental damage to the property. And, because in response to the court's inquiry the non-EIL defendant-appellants failed to articulate any new or additional evidence or argument that they would present in a subsequent trial, I cannot conclude that the trial court's failure to formally appoint lead counsel was reversible error.

Generally, when a party challenges a trial court's discretionary decision, the pertinent question upon review is whether the court's ruling was an abuse of discretion that deprived the party of a fair trial. (See, *e.g.*, *In re Estate of Hoover* (1993), 155 Ill. 2d 402, 420; *McDermott v. Metropolitan Sanitary District* (1992), 240 Ill. App. 3d 1, 31-43.) Thus, the question in this case is essentially whether the trial court's refusal to permit the non-EIL defendant-appellants to formally participate in trial amounted to an abuse of discretion that deprived these defendants of a fair hearing on the limited and specific coverage issues presented to and decided by the jury. It is in this context that the defendants' argument of procedural due process must be analyzed.

Although the linchpin of the majority's ruling is procedural due process, the majority fails to support its analysis with any precedent or jurisprudential basis. Generally, procedural due process means the opportunity to be heard at "a meaningful time and in a meaningful manner." (*Mathews v. Eldridge* (1976), 424 U.S. 319, 333, 47 L. Ed. 2d 18, 32, 96 S. Ct. 893, 902.) This principle is a "flexible [one] and calls for such procedural protections as the particular situation

demands." *Mathews*, 424 U.S. at 334, 47 L. Ed. 2d at 33, 96 S. Ct. at 902.

The trial court found that due process was satisfied in the present cause because American Empire acted at trial as the "virtual surrogate" for the non-EIL defendant-appellants. In so ruling, the court specifically relied on section 39 of the Restatement (Second) of Judgments. Section 39 states that generally "[a] person who is not a party to an action but who controls or substantially participates in the control of the presentation on behalf of a party is bound by the determination of issues decided as though he were a party." (Restatement (Second) of Judgments § 39 (1982).) The determination of whether there has been a sufficient degree of "participation" or "control" depends on all of the surrounding circumstances (*e.g.*, *Watts v. Swiss Bank Corp.* (1970), 27 N.Y.2d 270, 277, 265 N.E.2d 739, 743, 317 N.Y.S.2d 315, 320), and has been found to arise under factual circumstances very similar to those presented in the instant cause (*e.g.*, *Greenwich Insurance Co. v. N. & M. Friedman Co.* (6th Cir. 1905), 142 F. 944 (insurance company not party to earlier litigation bound by decision entered in that proceeding, where company attempted to raise identical policy defense already rejected in prior suit); *Iowa Electric Light & Power Co. v. Mobile Aerial Towers, Inc.* (8th Cir. 1983), 723 F.2d 50 (employer's claim barred where employer, although not party to earlier litigation, had participated in depositions taken in earlier case and shared certain litigation expenses)).

I find no manifest error in the trial court's factual determination that American Empire was the "surrogate" for the non-EIL defendant-appellants who were not permitted to formally participate in the trial. As the trial court correctly recognized, the factual issues decided at the EIL trial were virtually identical to the

factual assertions relied upon by the non-EIL defendant-appellants. Moreover, the discovery undertaken by all of the defendants, including the non-EIL defendant-appellants, was joint discovery, and all of the defendants cooperated extensively in their discovery efforts. For example, the defendants jointly retained and prepared experts for trial; one expert, Charles Fetter, stated in his deposition that his fees were paid by "the defense group." The defendants also filed joint Rule 220 inter-rogatory responses. If any defendant wished to disassoci-ate itself from the common defense group, the defen-dant was free to do so. In response to the court's specific inquiry, none of the non-EIL defendant-appellants could provide the court with additional evidence or argument it wished to present at a subsequent trial. No new evi-dence is likely to appear, since all of the discovery relat-ing to the Taylorville site was jointly conducted by the defendants and has long since closed.

In light of these circumstances, there was no abuse of discretion in the trial court's determination that the non-EIL defendant-appellants should not be permitted to relitigate the question of whether CIPS intended or expected the emissions or damages at issue with respect to the Taylorville site. As the trial court properly observed, the non-EIL defendant-appellants seek to conduct a "mirror image" trial in the hopes of convinc-ing a second jury, based on the same evidence and arguments already considered and rejected by the jury, to reach a different result. CIPS correctly argues that principles of due process clearly do not compel such a profound waste of judicial resources. Defendants in complex, multiparty litigation do not have a constitu-tional right to relitigate factual issues determined in an earlier phase of the proceeding. Due process does not require that parties be given multiple opportunities to raise the same question. (*Illinois Crime Investigating*

*Comm'n v. Buccieri* (1967), 36 Ill. 2d 556, 565.) There is no cogent reason, under due process analysis or on other basis, to afford to the non-EIL defendant-appellants the luxury of presenting to a second jury· (and possibly 47 juries) the same arguments and evidence that the first jury has already heard, considered, and rejected.

The trial court's decision to bar the non-EIL defendant-appellants from relitigating the issues decided by the jury's response to special interrogatories was a proper exercise of the court's discretionary power to manage and regulate the progress of the litigation CIPS had instituted against 47 defendant insurance carriers. The record in the present case is replete with instances where the trial court entered orders that streamlined the course of discovery, appointed liaison counsel, and set various dates for the progress of the litigation. These were admirable efforts by the trial court and their significance should not go underestimated. The record fully demonstrates that the trial court was judicious and meticulous in its efforts to hand down rulings that would further the progress of the litigation without sacrificing the due process rights of any of the parties. I can find no sound reason to reverse the able trial court's ruling in the present cause.

Complex litigation involving multiple defendants calls upon a trial judge to exercise considerable skill and judgment to manage the litigation so that matters are resolved both expeditiously and fairly. Because of its complex nature, such litigation requires that the trial judge be more actively involved in the administration and management of the case as it progresses through discovery to trial. I fear that the majority's disposition fails to appreciate the special circumstances presented when a trial judge must preside over complex, multi-party litigation. I also believe that the majority fails to respond to the call for guidance in this growing and

complicated area, despite the certified questions posed by the trial court in the present case. I find the majority's decision to be archaic and without legal basis. We can and must provide specific guidance to the trial court that "articulate[s] a consistent approach to these cases that copes with perceived problems in our litigation system while maintaining acceptable standards of due process." (McGovern, *Managing Complex Litigation*, 53 U. Chi. L. Rev. 440, 441 (1986).) The majority's disposition in the present cause falls far short of this goal.

For these reasons, I respectfully dissent.